[No. S042323. July 30, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
SHAUN KAREEM BURNEY, Defendant and Appellant.

COUNSEL

Geraldine S. Russell, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood, Warren P. Robinson and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

GEORGE, C. J.—A jury convicted defendant Shaun Kareem Burney of second degree robbery (Pen. Code, §§ 211, 212.5, 213, subd. (a)(2)),[1] kidnapping (§ 207, subd. (a)), kidnapping for purposes of robbery (§ 209, subd. (b)), and the first degree murder of Joseph Kondrath (§ 187). Allegations of robbery-murder and kidnapping-murder special circumstances (§ 190.2, subd. (a)(17)(A), (B)) were found true, and defendant was found to have personally used a deadly weapon (a firearm) in the commission of the murder (§ 12022.5). Following the penalty phase of the trial, a jury returned a verdict of death against defendant. The trial court denied the automatic motion to modify the penalty (§ 190.4, subd. (e)) and imposed a sentence of death. Defendant's appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

## I.

## PROCEDURAL HISTORY

In late July 1992, the Orange County Grand Jury returned an indictment against defendant and two codefendants, charging them each with second degree robbery (count I), kidnapping (count II), kidnapping for purposes of robbery (count III), and first degree murder (count IV). The indictment alleged against all three defendants the special circumstances of murder in the commission of a robbery and murder in the commission of a kidnapping. As to defendant, the indictment alleged as to all counts the personal use of a firearm, but shortly after the commencement of the guilt phase of the trial, the trial court granted the prosecution's motion to dismiss the firearm-use allegations against defendant in counts I, II, and III. As to the two codefendants, the indictment alleged they were vicariously armed with a firearm.

The three defendants were tried jointly in a jury trial that began in April 1994. The death penalty was sought only against defendant. The jury found

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

him guilty of the four counts charged against him, found that the murder was of the first degree, found the two special-circumstance allegations true, and found true the allegation that defendant personally used a firearm in the commission of the murder.[2] At the penalty phase of defendant's trial, the jury determined that defendant's punishment should be death.

## II.

## FACTS

### A. *Introduction*

In the early morning hours of June 10, 1992, defendant and his two codefendants, Burnett and Rembert, left their apartment intending to find and assault Ron Hussar, and to steal Hussar's car stereo. When Hussar could not be found, the three men decided to steal an automobile and then drive to an area where members of a rival gang resided, so they could shoot at them. The three men observed the victim, Joseph Kondrath, entering his automobile in a carport adjacent to Kondrath's apartment building. At gunpoint, they forced Kondrath out of the vehicle, robbed him of his wallet, and forced him into the trunk of his automobile.

The three men drove to the residence of Jeffrey Howard, from whom they borrowed a shotgun. They drove to an area where rival gang members resided, but did not observe any gang members. The group then drove to, and fired gunshots into, an apartment belonging to Cynthia Melson, Burnett's former girlfriend, and thereafter returned the shotgun to Howard.

The three men discussed the need to kill Kondrath because he had seen their faces and could identify them. They drove to Crescent Avenue in Anaheim and stopped the automobile. Defendant opened the trunk of the vehicle and fired one shot, which fatally struck Kondrath in the head. The men then fled the scene. The next day, defendant informed Jeannette Roper, Rembert's girlfriend, that he had shot the victim. During a videotaped police interrogation several days later, defendant confessed that he had kidnapped

---

[2] The jury found codefendant Allen Dean Burnett II (Burnett) guilty of the four counts charged against him, found that the murder was of the first degree, found the two special-circumstance allegations true, and found true the allegation that Burnett was armed with a firearm in the commission of the murder. The jury was unable to reach a verdict on the robbery and murder counts and the special circumstances as to codefendant Scott Boxer Rembert (Rembert), and the court declared a mistrial as to those counts. The jury found Rembert guilty of the kidnapping and kidnapping for robbery charges. The record does not reveal the outcome of Rembert's retrial, but the Attorney General states in his briefing that "[u]pon a third jury trial, Rembert was convicted of first degree murder with true findings of special circumstances." Both Burnett and Rembert ultimately were sentenced to life in prison without the possibility of parole.

and murdered Kondrath. Both Rembert and Burnett gave statements to the police, confirming that the three men discussed killing the victim because he had seen their faces, and that defendant shot Kondrath while the victim lay in the trunk.

B. *Guilt Phase Evidence*

1. *The prosecution*

Defendant was arrested on June 16, 1992, subsequently waiving his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602], and consenting to an audiotaped and videotaped interview with Detective Georgia Erickson and Detective Paul Gallagher. A transcript of the interview was read to the jury. The interview was redacted to eliminate references to the codefendants by name, replacing each occurrence of the codefendants' names with the word "other" or "others."[3]

During the course of the interview with Detectives Erickson and Gallagher, defendant offered numerous and sometimes contradictory versions of the events that took place on the night of Kondrath's murder. Defendant initially stated he had no information regarding a murder beyond knowing that a body had been found near the residence of his friend, David Wilson, but defendant did not dispute the statement of one of the detectives that defendant had been "going around town telling people that [he] did it." Defendant stated that on the night of Kondrath's murder, he and his two companions departed from an apartment where he had resided "on and off." The three men were angry at an acquaintance named Ron Hussar because Hussar had refused to take David Wilson to the hospital when Wilson accidentally shot himself in the foot. In retaliation, they planned to steal Hussar's car stereo and to assault Hussar. All three men donned latex gloves upon leaving the apartment in order to avoid leaving fingerprints when stealing Hussar's stereo. When they arrived at Hussar's residence, neither Hussar nor his automobile was present. The three men were exploring Hussar's neighborhood, still wearing the latex gloves, when they encountered Kondrath.

In his statement to the police, defendant stated that his companions suggested that he take the victim's automobile and, although defendant initially was hesitant, he joined his two companions in "rushing" the victim. According to this version of the events, defendant took the victim's keys, but after he and the others entered the vehicle, defendant asked to be dropped off

---

[3] Transcripts of police interviews with both of defendant's codefendants also were read to the jury. The statements are described in detail in connection with defendant's claim that the trial court erred in failing to sever his trial from that of his codefendants. The court instructed the jury that the statement of each defendant was to be considered only as to that particular defendant.

at the apartment where he had been residing. When the two men returned to that apartment some time later, they informed defendant they had parked the vehicle at an undisclosed location.

After further police questioning, defendant admitted he had not been dropped off but had stayed with his two companions. Defendant stated that his companions placed the victim in the trunk without defendant's knowledge or participation, although ultimately he admitted actively participating in forcing the victim from his vehicle and into the trunk at gunpoint. Initially, defendant denied that the trio had used a firearm to take the automobile from the victim. Defendant subsequently admitted that before the three men approached the victim, defendant handed the firearm to one of his companions. Defendant explained that the robbery had commenced when, after observing the victim enter his vehicle, defendant approached the driver's side window and asked the victim the time. Prior to approaching the victim, defendant and the others discussed "jacking" the victim—which he explained to officers meant robbing him. When the victim rolled down the window of his automobile to respond to defendant's query about the time, defendant's companions forced the victim from his vehicle at gunpoint. The victim requested that defendant take the automobile but not hurt him. One of defendant's companions asked Kondrath for his wallet, which the victim handed to him, after which defendant and his companions placed Kondrath in the trunk.

According to defendant's statement, defendant drove away with the victim in the trunk. Sometime later, one of his companions stated to the group that, because the victim had observed them, it was necessary to kill him. One of defendant's companions said something about a credit card and then threw an object out of the window.

Defendant gave conflicting accounts concerning why the trio next went to the residence of Jeffrey Howard. Initially, he informed the detectives that the three men drove there because Howard had paged defendant. Later, defendant stated that he drove to Howard's residence because one of his companions directed him to do so. Defendant stated that while he remained in the vehicle, one of his companions went upstairs to Howard's apartment and returned with a shotgun.

Defendant and the others then drove to the neighborhood where they believed Watergate Crips gang members resided. As they were driving, one of defendant's companions asked the victim whether he could hear them, and after the victim answered that he could, the victim was told to "shut up." Defendant then made a U-turn; the two other men exited from the automobile, and one of them fired the shotgun several times into the air. Defendant

and his cohorts returned to Howard's residence to return the shotgun. At that location, defendant removed the latex gloves he had been wearing, because they were torn. To avoid leaving fingerprints, he placed socks on his hands. His two companions kept their latex gloves on.

During the police interview, defendant initially denied having shot the victim and claimed he had informed others he had shot the victim "[j]ust to seem like a bad ass." Eventually, however, defendant admitted that he himself had shot and killed the victim, allegedly at the instigation of his companions. Defendant's companions informed defendant repeatedly that the victim had to be killed because he had seen the men and would be able to identify them, and one of them threatened to "blast" the victim. Defendant stated that at first, he merely opened and then shut the trunk. When defendant opened the trunk again, the victim said, "don't hurt me." One of defendant's companions handed defendant a firearm and again directed him to kill the victim. Defendant did not hand the firearm back to his companion, who was drunk, because defendant feared being accidentally hit by gunfire if his companion were to attempt to shoot the victim. Instead, because he did not want to look at the victim's face, he shot him without taking aim. Defendant expressed remorse for having taken the victim's life, and stated that at the time he fired into the trunk, he did not intend to kill Kondrath and did not believe he had hit him with the shot.

After shooting Kondrath, defendant handed the gun back to one of his companions and ran away, meeting them and another man, Dwight Chandler, at the apartment where defendant had been staying. According to defendant's statement, on the night of the murder defendant did not ingest drugs and consumed only one 12-ounce can of beer. The next day, when defendant inquired concerning the whereabouts of the murder weapon, he was told it was gone. Later, defendant informed his girlfriend Summer and his friend Dwight Chandler about his participation in Kondrath's murder.[4]

Huntington Park Police Officer Joseph Settles testified that on June 10, 1992, he was employed as a civilian traffic enforcer for the Anaheim Police Department. At approximately 8:00 p.m. that day, he observed a white Volkswagen Jetta illegally parked in front of no-parking signs on Crescent Avenue. Settles issued a citation, and then opened an unlocked door to look inside the vehicle. Although he observed nothing unusual inside the automobile, outside he noticed a dark puddle caused by something dripping from the trunk beneath the right rear tire. After Settles called for additional police assistance, officers arrived and pried open the trunk, where they found the body of a White male, later identified as Joseph Kondrath.

---

[4] Dwight Chandler had died by the time of trial.

David Schindler, who resided on Crescent Avenue, testified that at approximately 5:00 a.m. on June 10, 1992, he was in his garage when he heard a loud noise. Schindler was uncertain whether what he heard was a gunshot, or had come from an automobile or a firecracker. The area was poorly illuminated. Schindler looked outside and saw two Black or Hispanic individuals, whom he could not identify, in the vicinity of a white automobile approximately 50 to 100 yards from his garage. This vehicle was parked in a no-parking zone in an industrial area containing empty and abandoned buildings. As Schindler watched, the two individuals fled by jumping a fence and running to a drainage ditch or culvert. Later, Schindler approached the vehicle but observed nothing unusual. He did not call the police.

William Townsend testified that at approximately 6:00 a.m. on June 10, 1992, he discovered a wallet lying in the street on Manchester Avenue in Anaheim approximately one mile from Crescent Avenue. The wallet contained Joseph Kondrath's personal papers, family photographs, and $1. Townsend turned the wallet over to the police later that day.

Dr. Masamichi Katsuyama conducted an autopsy on Kondrath's body. He testified there was a gunshot entrance wound on the left side of the back of Kondrath's head. There was discoloration to the back of the right hand, indicating that the weapon had been fired relatively close to the skin. A badly deformed bullet, having characteristics consistent with a .357-caliber bullet, was recovered near the midline of Kondrath's head. There were no other traumas or injuries to the victim's body. The cause of death was loss of blood from the gunshot wound to the head.

Anaheim Police Detective James Conley examined Kondrath's Jetta after his body was found. Latent fingerprints lifted from the automobile were identified as Kondrath's. A spent shotgun shell and shotgun casing were found on the right rear floorboard. A torn piece of latex was found between the right front passenger seat and the car door. Kondrath's Visa credit card was found in the same location. Mud debris was found on the floorboard between the front seats, and on a T-shirt, brace, and towel located on the right rear seat.

Detective Georgia Erickson testified that she interviewed Jeffrey Howard approximately one week after Kondrath was murdered. Howard informed Detective Erickson that codefendant Burnett arrived at Howard's residence early in the morning June 10, 1992, and asked to borrow a shotgun and shotgun shells. Burnett told Howard that he had a person confined in the trunk of his automobile. Howard informed Detective Erickson that Burnett returned the shotgun later that morning, and that he saw defendant behind the

wheel of the automobile when Howard accompanied Burnett to the first floor of his residence. Burnett told Howard he wanted the shotgun in order to shoot at a rival gang.

Jeffrey Howard testified that on June 10, 1992, he resided at 326 South Claudina Street in Anaheim. Between midnight and 2:00 a.m. that morning, codefendants Rembert and Burnett came to his residence and awakened him. Rembert was armed with a Derringer pistol that Howard previously had seen in Rembert's possession. Burnett asked Howard for a 12-gauge shotgun, which Howard gave him. During his testimony, Howard could not recall whether Burnett had explained why he wanted the shotgun. Howard testified that in addition to the shotgun, Howard gave Burnett red shotgun shells, loaded the shotgun with three shells, and gave Rembert a "handful" of bullets for the Derringer pistol. According to Howard, approximately one hour later Burnett returned the shotgun. Howard placed that weapon under his bed and went back to sleep, testifying he did not check the shotgun to determine whether it had been fired. Howard did not recall whether he informed Detective Erickson that Rembert and Burnett had said that someone was confined in the trunk of the automobile, that he had gone downstairs with Burnett, that he had stated to the detective that defendant was driving, or that Burnett had told him he intended to shoot at rival gang members. Howard denied ever carrying the Derringer pistol. He acknowledged that in his interview with the police, he had not mentioned that Rembert accompanied Burnett when Burnett arrived to borrow the shotgun. Howard testified that he did not observe defendant when the codefendants arrived at his apartment for the first time, and that the street below his apartment was not visible from the second story.

Howard further testified that on June 11, 1992, he returned the shotgun to Ryan Leuta, who owned the gun and occasionally lent it to others. Howard denied ever having possession of the Derringer pistol. He gave the remainder of the shotgun shells and bullets in his possession to Detective Erickson.

Detective Conley testified that a shotgun and a .357-caliber Derringer pistol were recovered from the residence of Ryan Leuta on June 16, 1992. Criminalist Dennis Fuller testified that in his opinion, the shell casing found on the rear floorboard of the victim's automobile had been fired from the shotgun recovered from Leuta's residence.

Jeffrey Howard's mother-in-law, Deborah Cook, testified that she resided with her daughter, Lakesha Howard, and Jeffrey Howard at the Howards' apartment. On June 10, 1992, at approximately 4:00 a.m., she was awakened by a knock on the front door. She answered the door and a male, who may have been codefendant Burnett, asked for Jeffrey. About an hour later, the

same person returned and asked for Jeff. Cook denied having informed Detective Erickson that three persons approached the door on both occasions on June 10. Cook was not acquainted with defendant.

Cynthia Melson testified that on June 10, 1992, she resided in an apartment located on Pine Street in Westminster. Melson's roommate, Marcia, and Melson's mother, Marjorie, also were present in the apartment on the morning of June 10. Melson was codefendant Burnett's ex-girlfriend, and Burnett and Rembert previously had resided at the Pine Street apartment with Melson. Melson had been acquainted with Burnett for approximately three years, but had ended their relationship approximately six months previously because they did not get along. Melson testified that at approximately 4:42 a.m., five or six shots were fired at her apartment. After the shots were fired, Melson heard her former boyfriend Burnett yell "fuck you." The shots damaged Melson's front door, the upstairs bedroom window, the downstairs kitchen window, and a wall in Marcia's bedroom. A bullet missed Marcia's head by six inches. Melson later discovered red shotgun cartridges on a patio by the front door of her residence. Melson was not acquainted with defendant and had not seen him prior to the trial.

Westminster Police Officer Cotrell testified that he recovered expended shotgun shell casings and wadding from inside the Melson residence after the shooting. Shotgun shell casings discovered at that location were from the same type of cartridge as the casings recovered from Kondrath's automobile. Criminalist Fuller opined that the shotgun shell casings found at the Melson residence and in the victim's automobile had been fired from the same shotgun. As Fuller explained, shotgun wadding protects pellets inside the shotgun and is expelled from the barrel of a shotgun. Fulton testified that wadding recovered from Melson's residence was made by the same manufacturer that produced the shotgun shells admitted in evidence. A copper slug and jacket found at the Melson apartment were consistent with a jacketed hollow-point bullet and had been fired from the Derringer pistol. The projectile recovered from the victim's head was a jacketed hollow-point .357- or .38-caliber bullet with markings consistent with having been fired from the top barrel of the Derringer. Based on test firing of the Derringer, Fuller concluded that the weapon was fired at close range.

Rembert's ex-girlfriend Jeannette Roper testified that on the morning of June 10, 1992, she was awakened by a phone call from Rembert. Rembert instructed her that if anyone were to inquire concerning his whereabouts the preceding night, she was to say he had spent that night with her. Later that day, Roper went to Rembert and Burnett's apartment, where she saw defendant. She testified that defendant informed her he had walked up to an automobile and asked the male driver for the time, but then pointed a firearm

at him and ordered him to get out of the vehicle. Defendant told her he shot the driver, and that it was his seventh murder. Detective Erickson testified that she spoke to Roper on June 15. Roper informed her that defendant stated he had shot a man in the head and then placed him in the trunk of the man's automobile. Erickson testified that Roper stated defendant and his codefendants initially had planned to, but ultimately did not, steal the victim's car stereo.

### 2. The defense

Defendant did not testify or present any other evidence in his defense. During opening and closing arguments, defense counsel contended that defendant was not guilty of murder under a felony-murder theory, because the robbery and kidnapping of Kondrath ended before the homicide took place. Counsel also asserted that defendant was guilty of only second degree murder, because Kondrath's murder was not deliberate and premeditated.

Codefendant Burnett did not testify, but presented evidence indicating that he was a chronic alcoholic and was intoxicated on the night of the murder.

Codefendant Rembert also did not testify. He presented the testimony of a psychologist who had conducted testing on Rembert. The psychologist concluded Rembert had a submissive personality and was "likely to go along with the crowd." She testified he was dependent on alcohol, abused drugs, suffered from depression, and had been diagnosed with adult antisocial behavior. She opined that Rembert "may not really have comprehended what was going on in a timely manner to make the kind of decision that he could have made." The psychologist acknowledged that Rembert previously had been arrested for assaulting a girlfriend and had pleaded guilty to assault in another case, but she nonetheless stated she did not believe Rembert had assaultive or aggressive tendencies.

### C. Penalty Phase Evidence

#### 1. The prosecution

The prosecution presented evidence regarding uncharged acts of violence, including multiple occasions on which defendant assaulted his former girlfriend and one occasion on which he assaulted his stepfather. Sylvia Carmona, who dated defendant for several years starting when she was 15 years of age and defendant was 16 years of age, testified that on one occasion, defendant locked her inside his residence and then hit her with his hand, causing a black eye for which she sought treatment at a hospital. Carmona admitted that she had thrown an iron at defendant prior to this assault, and

that she "put [defendant] down all the time." Carmona testified that on another occasion, defendant choked her, and that on a third occasion, defendant pulled her hair, causing her to fall to the ground.

Lee Thomas, defendant's stepfather, testified regarding defendant's violent conduct toward him. In May 1992, Thomas was residing in an apartment with defendant and his mother Ernestine Burney Thomas. Defendant was upset concerning a comment made by Thomas and confronted him outside the apartment. After a verbal exchange, defendant struck Thomas on the side of his face. After a further heated verbal exchange between defendant, Thomas, and Ernestine, defendant lunged at Thomas with a knife. Thomas testified that defendant hit Thomas either with the back of his hand holding the knife, or with the blunt part of the knife, but did not cut Thomas. At this point, Thomas picked up a large rock and warned defendant to depart. When Thomas went upstairs, defendant slashed the tires and the seat of Thomas's automobile with the knife. When the police arrived, defendant informed them the argument began because Thomas had made a comment about women with large buttocks and breasts, and stated he made a stabbing motion at Thomas and would have killed him had Ernestine not stepped in between them. He also informed the police that Thomas had hit him on a prior occasion, knocking him down. The police arrested defendant for assault, but the charges were dismissed.

Kondrath's parents, his fiancée, and one of his sisters testified concerning the impact of the murder upon them, the good and peaceful nature of the victim, and how much the victim's friends and family missed him.

### 2. The defense

Forensic psychologist Dr. Stephen Wells interviewed defendant and testified on his behalf. Dr. Wells opined that defendant, 18 years of age at the time of the murder, was a child in terms of intellectual development and social maturity. Wells believed defendant did not intend to kill the victim until he was influenced to do so by codefendant Rembert. Defendant was experiencing the symptoms of a manic-depressive mental disorder at the time of the murder. Defendant was a "follower" rather than a "leader." According to Wells, defendant expressed remorse for the murder and would not pose a danger to others in prison.

Wells determined that a series of traumatic events in defendant's life profoundly had affected his emotional functioning. When defendant was eight years of age, his mother took him to the out-of-town funeral of her father. When they returned, defendant's father, David Burney, had changed the locks on the door of the family residence, where he was residing with another

woman. Defendant and his mother stayed in motels and with friends for the next six months. At the time, defendant spoke of committing suicide and was taken to a psychologist. Defendant eventually reestablished contact with his father and, when he was 14 years of age, visited him in North Carolina at Christmas. Defendant remained in that state, residing with his father for a while but, after a disagreement, was ejected from his father's home and resided with his aunt for the remainder of the school year.

Wells further testified that when defendant was 18 years of age, his mother Ernestine married Lee Thomas. Defendant did not get along with Thomas, who physically abused Ernestine on many occasions, and defendant felt powerless to prevent this abuse. Wells also described the circumstances of defendant's assault on Thomas. At the time of trial, Ernestine no longer was residing with Thomas, but instead with defendant's father, David Burney. According to Wells, David Burney, who had had no contact with defendant since ejecting him from his home in 1988, refused to testify on defendant's behalf in the present proceedings.

David Burney's sister, Brenda Burney, testified that David was dishonest and unreliable, and had not been a good father to defendant.

Rogelio Onofre testified that after being released from jail following the assault on Thomas, defendant resided with Onofre, a friend of his since grade school, and Onofre's mother, Maria Gomez. Defendant wanted to reside with his mother, but could not do so because his release from police custody was conditioned on defendant having no further contact with her husband, Thomas. Defendant was deeply upset when, six days before the murder, Onofre's young niece accidentally drowned in a Jacuzzi. Onofre testified that his mother asked defendant to leave her residence because she believed he was associating with the wrong persons.

Forensic psychologist William Vicary examined defendant and concluded he was depressed and suicidal prior to the murder. Defendant frequently consumed alcohol and smoked marijuana. Defendant informed Vicary that he drank 40 ounces of malt liquor before committing the murder. Vicary acknowledged that defendant earlier had told a defense investigator that he had had nothing to drink before the murder. Vicary concluded that defendant was traumatized by the absence of his father. Defendant's mother physically abused him when he was a child, and defendant was traumatized by twice having been required to leave his father's home and then, just before the murder, being ejected from his mother's home. After defendant was required to leave Onofre's residence, he stayed with the codefendants and another person, who were gang members and who exerted a negative influence on defendant.

Vicary testified that defendant experienced remorse for killing the victim and would not constitute a danger while incarcerated. Vicary acknowledged, however, that he had determined defendant had an antisocial personality, and that on one occasion after defendant's arrest, he had violently attacked a Hispanic inmate who had called him a "nigger."

Ernestine Burney Thomas testified that she had a good relationship with defendant and that he loved children and enjoyed helping others. Rogelio Onofre testified that defendant was a loving person and a good friend, and that although he had seen defendant arguing with his ex-girlfriend, Sylvia Carmona, he could not imagine defendant pulling the trigger or shooting the victim. Maria Gomez testified that she had known defendant since he was nine years of age, and that he was like a son to her. Gomez stated that defendant was helpful with household chores, and that she could not believe that defendant could have been involved with a murder. Carol Warren, whose daughter, Leslie Coulter, was defendant's best friend since childhood, testified that defendant was well behaved, a sweet person, and a "joy to be around." Leslie Coulter testified that defendant was a very sweet person who always helped others, was good with children, and had known the codefendants only for a few months prior to the night of the murder. Coulter also stated that defendant was a good friend and a leader rather than a follower, and that she never had observed him acting violently or being involved in a fight.

## III.

## DISCUSSION

### A. *Asserted Errors Affecting the Guilt Phase of Trial*

#### 1. *Denial of defendant's motion to quash the grand jury indictment*

##### (a) *Facts*

At trial, defendant unsuccessfully moved to quash the indictment on the ground that the Orange County Grand Jury selection process was unconstitutional because of the absence of Asian-American prospective jurors in the venire. On appeal, defendant contends that the trial court's denial of his motion to quash was erroneous and violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and parallel provisions of the California Constitution, requiring reversal of the guilt and penalty judgments. Defendant's claim is without merit.

In connection with his motion to quash, defendant filed a motion for joinder in a case already pending in Orange County Superior Court, *People v.*

*Chan* (1994, No. 93ZF0012) (*Chan*). The defendant in *Chan*, joined by defendant and numerous other defendants whose trials were then pending in Orange County, alleged unconstitutional discrimination against Asian-Americans in Orange County's grand jury selection process.

A lengthy hearing was held in the *Chan* proceedings. John Weeks, who held a Ph.D. in demography, testified on behalf of the defendants. Weeks explained that, from a pool of 157 applicants for the 1992–1993 Orange County Grand Jury that indicted the defendants, 30 persons ultimately were selected as grand jurors. Of the 157 applicants for the grand jury, nine were nominated by judges, and the others were self-nominated. None of the nine persons nominated by judges was Asian-American. In the previous 10 years, only one Asian-American had been nominated by a judge. Regarding the grand jury that returned the indictment against defendant, four of the persons nominated by judges actually became grand jurors. In past years, persons nominated by judges were statistically more likely to become grand jurors. Weeks acknowledged that, because judges subsequently selected all of the members of the grand jury, every person ultimately chosen for grand jury service had been, in effect, nominated by a judge. For purposes of the defense motion to quash the indictment, Weeks considered the composition of the grand jury *pool*, as opposed to the grand jury itself, to be the relevant inquiry.

In the 1992–1993 grand jury pool, there were nine minority group members, including two Asian-Americans. The two Asian-Americans later withdrew their applications, and accordingly no Asian-Americans were seated on the grand jury. One African-American and four Hispanic jurors were seated on the grand jury.

The percentage of Asian-Americans in the grand jury pool was only 1.3 percent. Among persons over 18 years of age in Orange County, the percentage of Asian-Americans was 11.7 percent. In his initial testimony, Weeks did not exclude from his calculations Asian-Americans who were not fluent in the English language and therefore were not qualified to serve as grand jurors. Under this initial analysis, the "absolute disparity" for Asian-Americans in the jury pool was 10.4 percent (11.7 percent minus 1.3 percent) and the "relative disparity" was 89 percent (10.4 over 11.7 multiplied by 100). Weeks concluded there was no statistical possibility that such a relative disparity could occur by chance. Weeks testified again after adjusting his calculations to exclude non-English-speaking Asian-Americans, and stated that the absolute disparity for Asian-Americans in the grand jury pool was 6.4 percent or less, depending on the level of proficiency of English that was being considered.

Among 2,335 persons contacted in a random Orange County sampling who indicated they qualified for federal jury service on the basis of their American

citizenship and proficiency in English, the percentage of Asian-Americans was 8.5 percent. Persons who sit as grand jurors, however, are usually older than the general population and retired. Weeks estimated that, within Orange County, there were 5,601 Asian-Americans of retirement age (i.e., 60 years of age or older) but under 75 years of age who would qualify for grand jury service. Some of those persons, Weeks testified, might not speak English perfectly, and a large proportion of them would have been born outside the United States. Weeks speculated that a lack of familiarity with the grand jury system would make Asian-American potential grand jurors reluctant to participate in it. Weeks did not know whether Asian-Americans tended to be involved in family businesses more than persons in the general population and, therefore, to retire at a later age. Taking these calculations and variables into account, Weeks concluded there was "some" systematic exclusion of Asian-Americans and other minorities in the application process for the grand jury pool.

A declaration signed by Orange County Jury Commissioner Alan Slater, with attached exhibits, was admitted into evidence for purposes of the hearing on the motion to quash the grand jury indictments. In the declaration and in testimony given at the hearing, Slater explained that a committee of 15 superior court judges selected a grand jury panel of 30 persons from which 19 would be randomly selected to serve as grand jurors. The remaining 11 persons on the panel would serve as alternates.

Throughout the year, the superior court clerk's office distributed grand jury information to an ever-increasing number of "organizations of all varieties," encouraging as many persons as possible to apply to serve as grand jurors.[5] Slater further testified that the clerk's office attempted to be inclusive of all possible ethnic groups, attempted to enlist the mass media in an effort to

[5] Among such organizations sent materials, on a mass mailing list for minority organizations, were the following: American Vietnamese Fellowship; Asian American Planning Council; Asian American Drug Abuse Program; Asian American Christian Fellow Student Activities; Asian American Youth Services; Asian Hispanic American Association, California State University, Fullerton (CSUF); Asian Pacific American Legal Center; Asian Pacific Counseling and Treatment Centers; Asian Rehabilitation Services; The Cambodian Family; Cambodian Student Association, CSUF; Chinese Christian Fellowship; Chinese Student Association, CSUF; Elderly Korean American Association of Orange County; Hoi Ai Huu Cuu N. Trung Voung; Hoi Phat Giao Tuong Te.Nam Cal.; International Sangha Bhiksu; Japanese American Citizens League; Japanese American Citizens; Japanese Student Association, CSUF; Korean American Association; Korean American Bible Study, CSUF; Korean Student Association, CSUF; Korean Youth Center; Lao Family Community, Inc.; Little Saigon Community Development Organization; Little Tokyo Service Center; Operation Japanese American Association; Oriental Service Center; Filipino American Student Association; United Cambodian Community, Inc.; Vietnamese American Council; Vietnamese Chamber of Commerce; Vietnamese League of Orange County; Vietnamese Pharmacists Association; Vietnamese Service Center; and Vietnamese Student Association, CSUF.

inform persons in the community about jury service, and sent persons to speak about grand jury service to "anyone who is willing to listen."

Grand jurors are required to work full time for a year and at times on evenings and weekends, and are compensated by daily fees of $25, up to a maximum of $100 per week. In the previous 10 years, there had been 22 applications by Asian-Americans for grand jury service and six occasions on which Asian-Americans had been chosen as grand jurors.

William Gyak, the Orange County demographer, testified that, of the persons in the county between the ages of 60 and 74 years of age who were very proficient in the English language, only 2.1 percent, or 3,011, were Asian-Americans and Pacific Islanders. Of the 240,000 Asian-Americans and Pacific Islanders in the county, 91,000 resided in areas having average incomes above the county median. For the prior 10-year period, Asian-Americans who applied for grand jury duty had a statistically greater chance of becoming grand jurors than did White applicants. Gyak explained that comparative disparities in statistics tend to be magnified when the group under consideration forms a very small proportion of the population in question.

Finally, John Mei Liu, a professor of comparative culture, testified that Asians constituted a distinct group.

(b) *Discussion*

■ We set forth the relevant legal inquiry in *People v. Horton* (1995) 11 Cal.4th 1068, 1087–1088 [47 Cal.Rptr.2d 516, 906 P.2d 478]. Although that decision concerned petit juries, the same standard applies in evaluating the composition of grand juries. (*Vasquez v. Hillery* (1986) 474 U.S. 254, 261–262 [88 L.Ed.2d 598, 106 S.Ct. 617].)[6]

"Under the federal and state Constitutions, an accused is entitled to a jury drawn from a representative cross-section of the community. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 16; *Duren* v. *Missouri* (1979) 439 U.S. 357, 358–367 [58 L.Ed.2d 579, 99 S.Ct. 664]; *People* v. *Howard* (1992) 1 Cal.4th 1132, 1159 [5 Cal.Rptr.2d 268, 824 P.2d 1315].) That guarantee mandates that the pools from which juries are drawn must not systematically exclude distinctive groups in the community. (*People* v. *Mattson* (1990) 50 Cal.3d 826, 842 [268 Cal.Rptr. 802, 789 P.2d 983].) 'In order to establish a prima facie

---

[6] Although defendant is African-American rather than Asian-American, he need not be a member of a particular group to challenge its exclusion. (*People v. Johnson* (1989) 47 Cal.3d 1194, 1217, fn. 3 [255 Cal.Rptr. 569, 767 P.2d 1047]; *People v. Wheeler* (1978) 22 Cal.3d 258, 281 [148 Cal.Rptr. 890, 583 P.2d 748].)

violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.' (*Duren* v. *Missouri, supra*, 439 U.S. at p. 364 . . . ; [citation].) The relevant 'community' for cross-section purposes is the judicial district in which the case is tried. (*People* v. *Mattson, supra*, 50 Cal.3d at p. 844; *Williams* v. *Superior Court* (1989) 49 Cal.3d 736, 744–745 [263 Cal.Rptr. 503, 781 P.2d 537].) If a defendant establishes a prima facie case of systematic underrepresentation, the burden shifts to the prosecution to provide either a more precise statistical showing that no constitutionally significant disparity exists or a compelling justification for the procedure that has resulted in the disparity in the jury venire. (*People* v. *Sanders* (1990) 51 Cal.3d 471, 491 [273 Cal.Rptr. 537, 797 P.2d 561].)

"As to the third element of the *Duren* test, a defendant does not meet the burden of demonstrating that the underrepresentation was due to systematic exclusion, by establishing only statistical evidence of a disparity. A defendant must show, in addition, that the disparity is the result of an improper feature of the jury selection process. (*People* v. *Howard, supra*, 1 Cal.4th at p. 1160; *People* v. *Bell* (1989) 49 Cal.3d 502, 530 [262 Cal.Rptr. 1, 778 P.2d 129].) When a county's jury selection criteria are neutral with respect to race, ethnicity, sex, and religion, the defendant must identify some aspect of the manner in which those criteria are applied (the probable cause of the disparity) that is constitutionally impermissible. (*People* v. *Sanders, supra*, 51 Cal.3d at p. 492; *People* v. *Bell, supra*, 49 Cal.3d at p. 524.)" (*People v. Horton, supra*, 11 Cal.4th at pp. 1087–1088, italics omitted.)

In the present case, the trial court hearing the motion to quash the grand jury indictments issued an order denying the motion, concluding that it "border[ed] on being frivolous." Acknowledging a conflict in the law regarding whether "Asians" constituted a cognizable group for purposes of constitutional analysis, the court nonetheless concluded that they did not constitute a cognizable group, because they did not share a common language or common historical factors. Rather, according to the court, the term "Asians" includes groups such as Chinese and Filipinos, separate ethnic groups that *do* constitute cognizable groups. Additionally, relying on *People v. Bell, supra*, 49 Cal.3d 502, 527, footnote 14, in which we criticized the use of tests more complex than the absolute disparity test when the group allegedly excluded is very small, the court concluded that because the absolute disparity in the present case was estimated at 3.8 percent by Gyak, and 6.4 percent by Weeks, the disparity was constitutionally insignificant. (See *People v. Bell, supra*, 49 Cal.3d at p. 528, fn. 15 [noting that absolute disparity levels of less than

11.49 percent have been found to be constitutionally insignificant].) The trial court also stated it was making its decision without reaching the third prong of the test articulated in *Duren v. Missouri, supra*, 439 U.S. 357, 364.

Whether "Asians" can or do constitute a cognizable group is an unsettled issue. We previously have observed, however, that "it is at least questionable whether the generic description Asian . . . can constitute a 'cognizable group.' " (*People v. Johnson, supra*, 47 Cal.3d at p. 1217, fn. 3, citing *U.S. v. Sgro* (1st Cir. 1987) 816 F.2d 30.) We need not decide that question, however, because defendant has not met his burden of satisfying the third prong of the test articulated in *Duren v. Missouri, supra*, 439 U.S. 357—that there was "systematic exclusion" of Asians from the grand jury selection process. (*People v. Bell, supra*, 49 Cal.3d at pp. 527–528 [declining to resolve the question of whether a cognizable group was underrepresented, because defendant failed to show any disparity was caused by "systematic exclusion"].) As detailed above, Jury Commissioner Slater's declaration and testimony detailed the exhaustive efforts undertaken by the Orange County Superior Court Clerk's Office to invite Asian-Americans to apply for grand jury service. The defendants bringing the motion to quash offered no evidence to rebut the showing of substantial efforts undertaken by the county to include Asian-Americans in the venire, and offered no proof of any improper feature of the jury selection process. The defendants therefore failed to establish a prima facie case that the statistical discrepancies identified were caused by any systematic exclusion of Asian-Americans. Defendant's briefing in this court focuses upon the status of Asians as a cognizable group and upon the statistical comparisons that should be applied to claims of discrimination against prospective grand jurors, but points to no evidence in the record that would establish systematic exclusion. Accordingly, there is no merit in defendant's claim that Asian-Americans unconstitutionally were excluded from the grand jury that indicted him, and the trial court properly denied the motion to quash his indictment on that basis.

## 2. *Denial of defendant's severance motion*

Defendant puts forth intertwined claims that the trial court erred in denying his pretrial and midtrial motions for severance, and in admitting into evidence at the guilt phase the redacted statements of codefendants Rembert and Burnett, admission of which assertedly implicated him in the charged crimes and deprived him of his right to confront and cross-examine witnesses under the Sixth Amendment to the United States Constitution in violation of *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265] (*Aranda*) and *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620] (*Bruton*). Defendant contends the trial court's denial of his motions for severance violated his rights under the Fifth, Sixth, Eighth, and

Fourteenth Amendments to the federal Constitution and parallel provisions of the California Constitution, requiring reversal of the guilt and penalty judgments. For the reasons outlined below, we conclude that the trial court did not err.

### (a) *Facts*

Defendant gave a long, detailed statement to the police implicating himself and his codefendants in the crimes committed against victim Joseph Kondrath. Codefendants Rembert and Burnett also made statements to law enforcement officers implicating defendant and themselves in the crimes, and naming defendant as Kondrath's killer.

Before trial, defendant moved to sever his trial from that of his codefendants. Defendant contended that a joint trial would be unfair because, among other reasons, the prosecution intended to introduce into evidence the statements made by codefendants Rembert and Burnett to the police, in violation of *Aranda, supra*, 63 Cal.2d 518, and *Bruton, supra*, 391 U.S. 123. Defendant asserted that a joint trial would prejudice him, because Rembert's and Burnett's statements implicated him in the charged offenses, and because the codefendants' defenses were in conflict with his own. The prosecutor opposed the motion, arguing the statements could be redacted to remove references identifying each of the other codefendants, thereby protecting all three defendants' constitutional right of confrontation. The prosecutor submitted to the trial court proposed redactions in the statements. The court denied the severance motion, concluding that the proposed redactions sufficiently protected the rights of each defendant. The redacted statements of defendant and both codefendants were read to the jury during trial. The jury was instructed to consider these statements against the speaker only and not against any other defendant. After admission of the statements, defendant renewed his motion for severance, and the court again denied the motion.

As noted, defendant's statement and his codefendants' statements were received in evidence in a redacted form that eliminated direct references to defendant, Burnett, or Rembert by deleting the names of each declarant's codefendants, and substituting terms such as "the others" or "the other."[7] The codefendants' statements largely tracked defendant's own statement, but as pertinent here, both Burnett and Rembert stated that they advised "the others" not to kill the victim, contradicting defendant's contention in his own statement that "the others" repeatedly urged defendant to shoot Kondrath.

---

[7] The transcripts of the redacted statements were read to the jury, and copies of them were provided to each of the jurors during their deliberations. The words "the other" and "the others" do not appear in quotations or brackets, and are not otherwise highlighted. With the exception of some statements that have been deleted with the use of obvious censor's lines, the redactions in the transcripts that were read and provided to the jurors are not apparent.

Specifically, codefendant Burnett's statement confirmed that the three codefendants departed from their shared apartment the night of the murder, intending to steal Ron Hussar's stereo. According to Burnett's statement, although Burnett was drunk and did not want to go, he went anyway. Burnett also informed the police that all three defendants wore latex gloves and encountered the victim sitting in his automobile as they left Hussar's carport. The three men spoke about robbing the victim and using his automobile to "blast" the Watergate gang, who were involved in an ongoing dispute with Burnett. Burnett stated that one of the codefendants asked the victim for the time, and that when Kondrath rolled down the car window, this codefendant placed a gun through the window and ordered the victim out of his automobile. Burnett said he and the others "snatched" the victim out of his automobile and ordered him into the trunk.

According to Burnett's statement, with the victim still in the trunk Burnett proceeded to Jeffrey Howard's residence and borrowed a shotgun with which to "blast" the Watergate gang members. Upon arriving in Santa Ana, the Watergate gang's territory, Burnett and "the others" did not observe any Watergate members. Burnett nonetheless fired the shotgun into the air just to let the Watergate gang members know they were there. Burnett then returned the shotgun to Howard. Burnett and "the others" obtained additional bullets for the handgun from Howard.

Burnett related in his statement that he "passed out" or fell asleep in the backseat of the automobile. When he awoke, the vehicle was stopped. Burnett wanted to leave, but one of the "others" told him to shoot the victim because the latter had observed them. According to Burnett, he refused and told his companion not to do it. Burnett informed "the others" that the victim could just be left somewhere and they could walk home. The third companion also said not to shoot the victim. The person with the gun, however, said, "fuck it, I'll do it." One of Burnett's companions wiped down the automobile with a sock. The person with the gun opened the trunk, shot the victim one time, and closed the trunk. Burnett stated that he and "the others" then ran away.

In his statement to the police, codefendant Rembert initially denied all culpability and informed the detectives that he merely had heard about the murder. Ultimately Rembert admitted being present during the commission of the charged crimes and was asked: "What pushed the others over the edge?" Rembert replied, "one was drunk and the other one just wanted to go ahead and do it." Throughout the interview, Rembert insisted that he did not have any role in the murder, and that he told the others not to kill the victim. When asked about the reason for the killing, Rembert replied his companions were not thinking and must have been drunk. Rembert claimed he was across the street when the victim was killed. Rembert also stated that when the three

men left the apartment, they spoke of stealing a stereo, but there was no discussion of killing anyone. Toward the end of the interview, Rembert informed the detectives that the two other men had tricked the victim by asking him for the time and, after the victim rolled down his window, Rembert's companions put a gun to the victim's head and ultimately placed him inside the trunk of the victim's vehicle.

## (b) Discussion

### (1) Aranda/Bruton

■ Turning first to the constitutional issue, defendant contends the admission into evidence, at his joint trial, of the codefendants' out-of-court statements violated state law and deprived him of his rights to confront and cross-examine witnesses under the Sixth Amendment to the United States Constitution. (*Bruton, supra,* 391 U.S. 123; *Aranda, supra,* 63 Cal.2d 518.) We recently set forth the governing law in great detail in *People v. Lewis* (2008) 43 Cal.4th 415 [75 Cal.Rptr.3d 588, 181 P.3d 947] (*Lewis*). As we explained in that case, "[a] criminal defendant has a right, guaranteed by the confrontation clause of the Sixth Amendment to the United States Constitution, to confront adverse witnesses. The right to confrontation includes the right to cross-examination. (*Pointer v. Texas* (1965) 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065].) A problem arises when a codefendant's confession implicating the defendant is introduced into evidence at their joint trial. If the declarant codefendant invokes the Fifth Amendment right against self-incrimination and declines to testify, the implicated defendant is unable to cross-examine the declarant codefendant regarding the content of the confession.

"In *Bruton,* the United States Supreme Court held that the admission into evidence at a joint trial of a nontestifying codefendant's confession implicating the defendant violates the defendant's right to cross-examination guaranteed by the confrontation clause, even if the jury is instructed to disregard the confession in determining the guilt or innocence of the defendant. (*Bruton, supra,* 391 U.S. at pp. 127–128, 135–137.) The high court reasoned that although juries ordinarily can and will follow a judge's instructions to disregard inadmissible evidence, 'there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.' (*Id.* at p. 135.) Such a context is presented when 'the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial.' (*Id.* at pp. 135–136.)" (*Lewis, supra,* 43 Cal.4th at p. 453.)

In *Aranda, supra,* 63 Cal.2d 518, this court came to a conclusion similar to that subsequently reached by the high court in *Bruton,* but we also held that a codefendant's confession may be introduced at the joint trial if it can be edited to eliminate references to the defendant without prejudice to the confessing codefendant. (*Aranda, supra,* 63 Cal.2d at pp. 530–531; see also *Lewis, supra,* 43 Cal.4th at p. 454.) As the United States Supreme Court similarly concluded, "[T]he Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." (*Richardson v. Marsh* (1987) 481 U.S. 200, 211 [95 L.Ed.2d 176, 107 S.Ct. 1702].)

"[E]diting a nontestifying codefendant's extrajudicial statement to substitute pronouns or similar neutral terms for the defendant's name will not invariably be sufficient to avoid violation of the defendant's Sixth Amendment confrontation rights." (*People v. Fletcher* (1996) 13 Cal.4th 451, 468 [53 Cal.Rptr.2d 572, 917 P.2d 187].) If a codefendant's confession cannot be so edited, severance is required. (*Lewis, supra,* 43 Cal.4th at p. 454; *Aranda, supra,* 63 Cal.2d at pp. 530–531.) " '[T]he sufficiency of this form of editing must be determined on a case-by-case basis in light of the statement as a whole and the other evidence presented at the trial.' " (*Lewis, supra,* 43 Cal.4th at p. 454, quoting *People v. Fletcher, supra,* 13 Cal.4th at p. 468.) " '[R]edactions that simply replace a name with an obvious blank space or a word such as "deleted" or a symbol or other similarly obvious indications of alteration . . . leave statements that, considered as a class, so closely resemble *Bruton*'s unredacted statements that . . . the law must require the same result.' " (*Lewis, supra,* 43 Cal.4th at p. 455, italics omitted, quoting *Gray v. Maryland* (1998) 523 U.S. 185, 192 [140 L.Ed.2d 294, 118 S.Ct. 1151] (*Gray*).) When, despite redaction, the statement obviously refers directly to the defendant, and involves inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial, the *Bruton* rule applies and introduction of the statement at a joint trial violates the defendant's rights under the confrontation clause. (*Lewis, supra,* 43 Cal.4th at p. 455; *Gray, supra,* 523 U.S. at pp. 196–197.)

Turning to the present case, we observe that the redacted statements of codefendants Rembert and Burnett did not completely eliminate any reference to the "existence" of accomplices (cf. *Richardson v. Marsh, supra,* 481 U.S. at p. 211) and, as the Attorney General concedes, the statements in conjunction with other evidence led to the obvious inference that defendant was "the other" who shot Kondrath. (*Gray, supra,* 523 U.S. at p. 193.) The redactions in the present case did not satisfy the standard set forth in *Gray, supra,* 523 U.S. at pages 196–197. As explained above, when, despite redaction, a

codefendant's statement obviously refers directly to the defendant and implicates him or her in the charged crimes, the *Bruton* rule applies and introduction of the statement at a joint trial violates the defendant's rights under the confrontation clause. (*Lewis, supra*, 43 Cal.4th at p. 455; *Gray, supra*, 523 U.S. at pp. 196–197.)

■ It is well established, however, that *Aranda/Bruton* error is not reversible per se, but rather is scrutinized under the harmless-beyond-a-reasonable-doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]. (*People v. Anderson* (1987) 43 Cal.3d 1104, 1128 [240 Cal.Rptr. 585, 742 P.2d 1306].) In determining whether improperly admitted evidence so prejudiced a defendant that reversal of the judgment of conviction is required, we have observed that "if the properly admitted evidence is overwhelming and the incriminating extrajudicial statement is merely cumulative of other direct evidence, the error will be deemed harmless." (*Id.* at p. 1129.)

In the present case, the prosecution advanced, and the jury was instructed on, three theories of first degree murder relating to the homicide of Joseph Kondrath: felony murder based upon robbery, felony murder based upon kidnapping, and deliberate and premeditated murder. The jury returned a general verdict finding defendant guilty of the first degree murder of Kondrath. As set forth below, overwhelming evidence, apart from the codefendants' statements, supports defendant's conviction of either deliberate, premeditated first degree murder, or one or both theories of felony murder, as well as the true findings on the kidnapping-murder special circumstance and the robbery-murder special circumstance. Accordingly, when viewed in the context of the instructions given to the jury and the evidence supporting defendant's convictions for the first degree murder, robbery, and kidnapping of Kondrath and the kidnapping-murder and robbery-murder special circumstances, any error in admitting the codefendants' statements was harmless beyond a reasonable doubt. (*Chapman v. California, supra*, 386 U.S. at p. 24; see *Lewis, supra*, 43 Cal.4th at p. 456.)

■ To prove a defendant guilty of kidnapping, the prosecution must establish that (1) the defendant took, held, or detained another person by using force or by instilling reasonable fear; (2) using that force or fear, the defendant moved the other person, or made the other person move a substantial distance; and (3) the other person did not consent to the movement. (§ 207, subd. (a).)

There was overwhelming evidence establishing that defendant committed the crime of kidnapping—that is, that he either forced Kondrath into the trunk of Kondrath's automobile at gunpoint, or aided and abetted in the kidnapping

of Kondrath by participating in transporting him over a substantial distance without his consent.[8] There also was overwhelming evidence provided by defendant's own statement to the police (and his statements to other witnesses) establishing that defendant killed Kondrath during the commission of that kidnapping, and that he did so to advance the commission of the kidnapping—that is, to eliminate Kondrath as a witness. (See *People v. Green* (1980) 27 Cal.3d 1, 61 [164 Cal.Rptr. 1, 609 P.2d 468].) Defendant informed the police that he and the codefendants forced Kondrath into the trunk of Kondrath's automobile at gunpoint and repeatedly discussed the need to kill him because he had seen their faces and would be able to identify them.

Defendant contended at trial, and asserts in his briefing in this court, that the kidnapping-related counts cannot stand, and therefore the prosecution cannot establish absence of prejudice arising from the *Aranda/Bruton* error, because the kidnapping was completed prior to Kondrath's murder. This is so, he asserts, because at the time defendant shot Kondrath (1) the automobile was parked on the side of the road; (2) movement of the victim had ceased; (3) defendant had reached a place of temporary safety; (4) there was no other ongoing felonious conduct; and (5) defendant did not exhibit a single-minded purpose in committing the shooting.

This defense, however, was not affected or undermined by the admission of the codefendants' redacted statements, because nothing in either Rembert's or Burnett's statements contradicted defendant's assertion that he and the others had stopped the vehicle, and had ceased moving the victim, at the time he shot Kondrath. In any event, defendant's claim substantively is without merit. As we previously have recognized, "the crime of kidnapping continues until such time as the kidnapper releases or otherwise disposes of the victim and [the defendant] has reached a place of temporary safety . . . ." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1159 [74 Cal.Rptr.2d 121, 954 P.2d 384]; see also *People v. Silva* (1988) 45 Cal.3d 604, 632 [247 Cal.Rptr. 573, 754 P.2d 1070]; *People v. Chacon* (1995) 37 Cal.App.4th 52, 60 [43 Cal.Rptr.2d 434].) In the present case, defendant and his codefendants placed the victim in the trunk of his own automobile, where he remained while the men drove around shooting at targets, and where he lay when he was shot. The circumstance that defendant had stopped the vehicle before shooting the victim does not establish that the victim had been released or otherwise disposed of, because

---

[8] "[T]he word 'substantial' means a 'significant amount' as contrasted with a distance that is 'trivial . . . .' " (*People v. Morgan* (2007) 42 Cal.4th 593, 606–607 [67 Cal.Rptr.3d 753, 170 P.3d 129].) The record does not provide us with the exact distance Kondrath was transported, but in defendant's statement to the police, he admitted to moving the victim more than a "trivial" distance. Specifically, defendant stated that after forcing Kondrath into the trunk of Kondrath's vehicle, defendant and "the others" drove to the home of Jeffrey Howard, then to the Watergate Crips gang area, then back to Howard's home, and finally to Crescent Avenue, where they parked the vehicle and defendant shot Kondrath.

the kidnapping was clearly still in progress when defendant stopped the car on a dark, isolated street, opened the trunk, and shot the victim in the head. "Because [the victim] was still being detained at the time of his murder, he was killed while defendant was engaged 'in the commission of' the kidnapping." (*People v. Silva, supra,* 45 Cal.3d at p. 632; see *People v. Farmer* (1983) 145 Cal.App.3d 948, 952 [193 Cal.Rptr. 788] ["A victim forcibly transported without [his] consent is still 'kidnaped' while the detention continues and an injury inflicted during detention is inflicted 'in the commission of' the kidnaping."].) Moreover, defendant had not reached a place of safety, as is evident by witness David Schindler's testimony that he saw two men flee the area of the shooting, and defendant's own statement to the police that he ran from the scene after shooting Kondrath.

The strong evidence of guilt—excluding the codefendants' statements but including defendant's own statements, in which he admitted all of the elements supporting the kidnapping-related counts and the kidnapping-murder special circumstance—supports the conclusion that any error in the admission of the codefendants' redacted statements was harmless beyond a reasonable doubt. Notably, the prosecutor did not rely upon Burnett's or Rembert's statements in discussing the kidnapping-related counts. Rather, during closing argument to the jury, the prosecutor pointed to defendant's own statement in support of the prosecution's contention that defendant was guilty of the kidnapping-related counts. Accordingly, we conclude that any error in the admission of the codefendants' redacted statements at the joint trial was harmless beyond a reasonable doubt (*Chapman v. California, supra,* 386 U.S. at p. 24) with regard to the jury's consideration of the kidnapping count, the kidnapping-felony-murder theory of first degree murder, and the special circumstance of murder during the commission of a kidnapping.

The error also is harmless beyond a reasonable doubt in relation to the jury's consideration of the robbery-felony-murder theory and the special circumstance of murder during the commission of a robbery. Robbery is the taking of "personal property in the possession of another against the will and from the person or immediate presence of that person accomplished by means of force or fear and with the specific intent permanently to deprive such person of such property." (CALJIC No. 9.40.) In his own statement, defendant told the police that he and his codefendants forced the victim from his car and into the trunk of the vehicle at gunpoint. Defendant told the police that he used the ruse of asking the victim for the time in order to get him to roll down his window; that prior to approaching the victim, he and the others discussed "jacking" the victim—which, he explained to the officers, meant robbing him; that he joined his codefendants in forcing the victim from the victim's automobile and into the trunk of the vehicle at gunpoint; and that the

keys to the automobile were mistakenly left in the keyhole of the trunk, forcing defendant to retrieve them before driving off in the victim's automobile.[9]

Accordingly, defendant admitted all of the elements supporting the robbery-related counts and the robbery-murder special circumstance, and strong evidence of guilt—exclusive of the codefendants' statements—supports the conclusion that any error in the admission of the codefendants' redacted statements was harmless beyond a reasonable doubt with regard to the robbery-related counts and the robbery-murder special circumstance.

■ Finally, defendant's statements to the police also provide overwhelming evidence in support of a conviction for deliberate, premeditated first degree murder. A murder that is premeditated and deliberate is murder of the first degree. (§ 189.) " 'In this context, "premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." ' " (*People v. Jurado* (2006) 38 Cal.4th 72, 118 [41 Cal.Rptr.3d 319, 131 P.3d 400], quoting *People v. Mayfield* (1997) 14 Cal.4th 668, 767 [60 Cal.Rptr.2d 1, 928 P.2d 485].) " 'An intentional killing is premeditated and deliberate if it occurred as the result of preexisting thought and reflection rather than unconsidered or rash impulse.' [Citation.] A reviewing court normally considers three kinds of evidence to determine whether a finding of premeditation and deliberation is adequately supported—preexisting motive, planning activity, and manner of killing—but '[t]hese factors need not be present in any particular combination to find substantial evidence of premeditation and deliberation.' " (*People v. Jurado, supra*, 38 Cal.4th at pp. 118–119.)

Defendant informed the police that very shortly after forcing the victim into the trunk at gunpoint, and again just before he shot the victim, defendant and his codefendants discussed the need to kill the victim because he would be able to identify them. Defendant further stated that, immediately prior to the shooting, his codefendant handed him the gun and instructed him to kill the victim, which defendant did by pointing the gun into the trunk and firing once. These facts provide overwhelming evidence of all three elements: preexisting motive, planning activity, and the manner of killing—pointing and shooting a gun at close range at the victim's head. It is true defendant also

---

[9] As set forth in detail in relation to defendant's contention that his convictions for the robbery-related counts are not supported by sufficient evidence, *post*, overwhelming evidence, contained in defendant's own statements, alternatively supports a finding that defendant was guilty of robbery because he intentionally aided and abetted the codefendants in taking the victim's wallet and therefore intended to permanently deprive the victim of money contained in that wallet.

stated to the police that he did not want to shoot Kondrath but did so at the urging of his codefendants, who, he informed the police, repeatedly insisted the victim must be killed because he had seen their faces. Despite defendant's urging his codefendants to let the victim live, defendant fired his weapon into the trunk, but only once, without aiming and with no intent to kill the victim. This alternative explanation, however, does not vitiate defendant's statements to the police that unequivocally establish both deliberation and premeditation on his part. Moreover, in light of the evidence of premeditation, a jury reasonably could disbelieve defendant's statements to the extent they attempted to minimize his culpability. Accordingly, defendant's own statements, standing alone and considered without reference to his codefendants' statements, provide overwhelming evidence supporting a conviction for deliberate, premeditated murder, and any error in admitting his codefendants' statements was harmless beyond a reasonable doubt with regard to this theory of first degree murder.

■ Because the *Aranda/Bruton* error was harmless beyond a reasonable doubt as to all three theories of first degree murder submitted to the jury, as well as to the true findings on the robbery-murder and kidnapping-murder special circumstances, such error provides no basis for reversing defendant's conviction for the first degree murder of Joseph Kondrath and for the kidnapping and robbery of Kondrath, or for setting aside the jury's true findings on the kidnapping-murder and robbery-murder special circumstances.

### (2) *Denial of defendant's severance motions*

■ We also conclude the trial court did not abuse its discretion in denying defendant's motions for severance—motions founded on defendant's contention that admission of the codefendants' statements would prejudice him at a joint trial. Our Legislature has expressed a preference for joint trials. (*Lewis, supra*, 43 Cal.4th at p. 452; *People v. Boyde* (1988) 46 Cal.3d 212, 231, 250 [250 Cal.Rptr. 83, 758 P.2d 25]; cf. *People v. Soper* (2009) 45 Cal.4th 759, 771–772 [89 Cal.Rptr.3d 188, 200 P.3d 816] [expressing judicial preference for joinder in context of joined charges].) "Section 1098 provides in pertinent part: 'When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials.' The court may, in its discretion, order separate trials if, among other reasons, there is an incriminating confession by one defendant that implicates a codefendant, or if the defendants will present conflicting defenses." (*Lewis, supra*, 43 Cal.4th at p. 452, citing *People v. Avila* (2006) 38 Cal.4th 491, 574–575 [43 Cal.Rptr.3d 1, 133 P.3d 1076]; see *People v. Massie* (1967) 66 Cal.2d 899, 917 [59 Cal.Rptr. 733, 428 P.2d 869].) "Additionally, severance may be called for when 'there is a serious risk that a joint trial would compromise a specific trial right of

one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.' " (*Lewis, supra*, 43 Cal.4th at p. 452, quoting *Zafiro v. United States* (1993) 506 U.S. 534, 539 [122 L.Ed.2d 317, 113 S.Ct. 933] [addressing severance under Fed. Rules Crim.Proc., rule 14, 18 U.S.C.]; see also *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40 [17 Cal.Rptr.3d 710, 96 P.3d 30].)

We review a trial court's denial of a severance motion for abuse of discretion based upon the facts as they appeared when the court ruled on the motion. (*Lewis, supra*, 43 Cal.4th at p. 453; *People v. Hardy* (1992) 2 Cal.4th 86, 167 [5 Cal.Rptr.2d 796, 825 P.2d 781].) If we conclude the trial court abused its discretion, reversal is required only if it is reasonably probable the defendant would have obtained a more favorable result at a separate trial. (*Lewis, supra*, 43 Cal.4th at p. 453; *People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 41; *People v. Keenan* (1988) 46 Cal.3d 478, 503 [250 Cal.Rptr. 550, 758 P.2d 1081].) "If the court's joinder ruling was proper when it was made, however, we may reverse a judgment only on a showing that joinder ' "resulted in 'gross unfairness' amounting to a denial of due process." ' " (*Lewis, supra*, 43 Cal.4th at p. 452, quoting *People v. Mendoza* (2000) 24 Cal.4th 130, 162 [99 Cal.Rptr.2d 485, 6 P.3d 150]; see also *People v. Soper, supra*, 45 Cal.4th at p. 783 [" 'if a trial court's ruling on a motion to sever is correct at the time it was made, a reviewing court still must determine whether, in the end, the joinder of counts or defendants for trial resulted in gross unfairness depriving the defendant of due process of law' "].)

As a threshold matter, in each count defendant was charged along with both of his codefendants with having committed " 'common crimes involving common events and victims.' " (*Lewis, supra*, 43 Cal.4th at pp. 452–453, quoting *People v. Keenan, supra*, 46 Cal.3d at p. 500.) In light of this circumstance, the trial court was presented with a "classic case" for a joint trial. (*Lewis, supra*, 43 Cal.4th at p. 453; see also *People v. Avila, supra*, 38 Cal.4th at p. 575; *People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 40; *People v. Keenan, supra*, 46 Cal.3d at pp. 499–500.)

Moreover, in judging the circumstances as they appeared at the time of the ruling on the motion (see *People v. Cleveland* (2004) 32 Cal.4th 704, 726 [11 Cal.Rptr.3d 236, 86 P.3d 302]), any error under *Aranda* and *Bruton* in admitting the codefendants' statements is to be evaluated under *Gray, supra*, 523 U.S. 185, decided in 1998, four years after defendant's 1994 trial. (*Lewis, supra*, 43 Cal.4th at p. 456.) In *Gray*, the high court extended *Bruton*'s reasoning regarding unredacted statements to *redacted* statements, holding that the Sixth Amendment barred the admission of statements that were redacted in a manner that operated "just like a confession that names the defendant—they point an accusatory finger at the person 'sitting at counsel

table,' i.e., the defendant on trial. ([*Gray, supra*, 523 U.S.] at p. 192.)" (*Lewis*, at p. 455.) As the Attorney General concedes, the redactions in the present case, although not as "obvious" as those considered in *Gray*, where the court substituted blanks and the word "delete" for the defendant's proper name, nonetheless led to the obvious inference that defendant was "the other" who shot Kondrath. Before *Gray*, however, "the law regarding the admissibility of redacted codefendant confessions was unsettled. (See, e.g., *People v. Fletcher, supra*, 13 Cal.4th 451.) Although *Gray* is retroactive to this case and we apply it here, we cannot fault the trial court for failing to anticipate *Gray*'s holding." (*Lewis, supra*, 43 Cal.4th at p. 455.) Therefore, no abuse of discretion appears in the denial of severance in the present case. (*Ibid.*)

Defendant nonetheless contends he was prejudiced by the denial of the severance motion and the admission of the codefendants' statements, because the defenses presented by his two codefendants were antagonistic to his defense. He asserts that both Burnett's and Rembert's statements minimized their own culpability in Kondrath's murder and in the crimes that preceded it, laying blame instead on defendant—improperly painting him as the "main perpetrator" and thereby undermining his defense that he was guilty only of second degree murder because he did not participate in the victim's kidnapping and robbery, and because he shot the victim only under threat by his codefendants.

Aside from defendant's own self-serving statements to the police, no evidence was presented at trial indicating that Burnett and Rembert, rather than defendant, were the "main perpetrators" of the crimes against Kondrath. As related above, defendant admitted in his statement that he joined his codefendants in robbing the victim of his automobile, asked the victim for the time as a ruse before forcing him from his automobile at gunpoint, was present when his codefendants demanded the victim's wallet and forced the victim into the trunk of his own automobile, and returned to the trunk to retrieve the victim's keys upon realizing the victim had left them in the keyhole.

Most notably, Jeanette Roper testified that defendant informed her—as he admitted in his statement to the police—that he shot the victim, and although he now contends the evidence established that he did so under threat of harm from his codefendants, neither his statement to the police nor any other evidence supports such a claim. In his statement, defendant merely claimed that the codefendants informed him repeatedly that the victim must be killed because he had seen the three men and would be able to identify them, and that one of the codefendants threatened to "blast" the victim himself. Nothing in defendant's statement indicates that either Burnett or Rembert threatened defendant with harm if he did not shoot the victim, and no other evidence

establishes that Burnett or Rembert, rather than defendant—who was the actual shooter—was "more culpable" for Kondrath's murder. Indeed, defendant specifically informed the detectives that he did not hand the gun to Burnett and did not insist that Burnett shoot the victim—not because defendant feared that Burnett intentionally would hurt defendant, but because he was frightened that Burnett was too drunk and accidentally might shoot defendant. Instead, defendant willingly chose to shoot the victim himself, and because defendant did not want to look at the victim's face, he shot him assertedly without taking aim.

Antagonistic defenses do not warrant severance unless the acceptance of one party's defense would preclude acquittal of the other. (*Lewis, supra*, 43 Cal.4th at p. 461; *People v. Hardy, supra*, 2 Cal.4th at p. 168.) Here, defendant's defense and those of his codefendants "were not so irreconcilable that only one could be guilty." (*Lewis, supra*, 43 Cal.4th at p. 461.) "The prosecution presented independent evidence supporting each defendant's participation in the group's mutual criminal endeavors. No gross unfairness resulted from the joint trial." (*Ibid.*; see also *People v. Avila, supra*, 38 Cal.4th at pp. 574–576; *People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 41; *People v. Box* (2000) 23 Cal.4th 1153, 1195–1197 [99 Cal.Rptr.2d 69, 5 P.3d 130].)

Defendant also asserts that the joint trial prejudiced him because his own statement was redacted to replace all instances of Burnett's name with the word "other," thereby precluding defendant from informing the jury that Burnett, who was older than defendant and had gang ties, initiated the events on the night of Kondrath's murder, and that defendant acted only at the urging of his older codefendants. No evidence of any significance was eliminated as a result of the redaction of defendant's statement. First, the circumstance that codefendant Burnett may have instigated the night's events does not obviate defendant's own admitted culpability in the crimes committed against Kondrath. Moreover, although defendant's specific references to Burnett were replaced with the word "other," the jury nonetheless was made aware of the *substance* of defendant's statements—that he left the apartment with two men, one of whom wanted to seek out Watergate Crips gang members in revenge for an earlier assault, that this same man directed defendant to go to Jeffrey Howard's home to borrow a shotgun, and that the men he was with fired that weapon in Watergate Crips territory.[10] The sole statement defendant points to in his own account that was deleted from the

---

[10] Nor was defendant precluded from arguing that he was unduly influenced by his "older" codefendants. Defendant was 18 years of age at the time of the murder. Rembert was 20 years of age, and Burnett also was 18 years of age, a few months older than defendant. Not only was the jury informed of the ages of the three defendants, but the age difference that defendant attempts to portray as dispositive, is, in fact, quite minimal, and nothing either in defendant's

transcript of defendant's interview is his assertion that Burnett gave him the weapon and told him to kill the victim. The omission of this statement did not prejudice defendant, however, because other statements made by him to the police informed the jurors that one of "the others" handed defendant a gun and told him to kill the victim, and that the reason defendant did not hand the gun back to "the other" was that defendant feared being accidentally shot by his drunken companion.

In sum, neither the redaction of the codefendants' statements nor the redaction of defendant's own statement prejudicially undermined defendant's defense, and the joint trial itself did not result in gross unfairness depriving defendant of a fair trial. If any error occurred, it did not result from the trial court's denial of severance, but from its related but separate ruling admitting codefendants Rembert's and Burnett's redacted statements. As we have explained above, the admission at the joint trial of these two statements "did not result in gross unfairness to defendant," and any error was harmless. (*Lewis, supra,* 43 Cal.4th at p. 456.)

### 3. *Denial of motion for sequestered* Hovey *voir dire*

Defendant contends the trial court's denial of his motion for sequestered voir dire pursuant to *Hovey v. Superior Court* (1980) 28 Cal.3d 1 [168 Cal.Rptr. 128, 616 P.2d 1301] was erroneous and violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and parallel provisions of the California Constitution, requiring reversal of the guilt and penalty judgments. This claim is without merit.

■ " 'In *Hovey v. Superior Court*[, *supra,*] 28 Cal.3d 1, 80 . . . , this court decided that in capital prosecutions the death-qualification portion of each prospective juror's voir dire should be sequestered, meaning that it should be conducted out of the presence of other prospective jurors. This court did not hold that sequestered voir dire was constitutionally required; instead, we mandated this practice as a rule of procedure.' " (*Lewis, supra,* 43 Cal.4th at p. 493, quoting *People v. Jurado, supra,* 38 Cal.4th 72, 100; see also *People v. Vieira* (2005) 35 Cal.4th 264, 287–288 [25 Cal.Rptr.3d 337, 106 P.3d 990]; *People v. Cudjo* (1993) 6 Cal.4th 585, 628 [25 Cal.Rptr.2d 390, 863 P.2d 635].) " 'In 1990, however, the voters abrogated this aspect of *Hovey* by enacting Proposition 115, which added section 223 to the Code of Civil Procedure. That statute provides, in part, that "where practicable" the trial court must conduct voir dire "in the presence of the other jurors in all criminal cases, including death penalty cases." (Code Civ. Proc., § 223.)' " (*Lewis, supra,* 43 Cal.4th at p. 493.)

---

own redacted statement or in the redacted statements of the codefendants omitted information regarding the age disparity among the three defendants.

We review the trial court's denial of defendant's motion for individual sequestered voir dire under the abuse of discretion standard. (*People v. Navarette* (2003) 30 Cal.4th 458, 490 [133 Cal.Rptr.2d 89, 66 P.3d 1182]; *People v. Waidla* (2000) 22 Cal.4th 690, 713–714 [94 Cal.Rptr.2d 396, 996 P.2d 46].) A trial court abuses its discretion only if its ruling falls outside the bounds of reason. (*People v. Waidla, supra*, 22 Cal.4th at p. 714.)

In the present case, defendant requested that the prospective jurors be examined outside the presence of the other jurors as to all issues, because individual questioning would lead the jurors to respond more truthfully and extensively, would prevent them from being influenced or affected by responses made by other prospective jurors, and would protect the privacy of prospective jurors. The trial court denied the motion without giving a statement of reasons, but indicated it would revisit its decision if necessary after the commencement of voir dire. The court informed counsel, however, that it would conduct questioning to ensure that a jury satisfactory to both sides was selected, and that if the allotted peremptory challenges proved inadequate, the court would provide additional challenges to all sides until a satisfactory jury was seated. It is evident, from the trial court's statement, that the court intended to revisit the issue of individualized voir dire if necessary and that it understood it had discretion to conduct individual voir dire, but that it declined to do so because it felt that group voir dire, with questioning conducted by the trial court and with ample peremptory challenges provided to defendant, adequately would safeguard defendant's constitutional right to an impartial jury. In view of the circumstance that defendant offered only generalized grounds for conducting individual voir dire, not specific to his case, the trial court's ruling did not fall outside the bounds of reason. (See *People v. Jurado, supra*, 38 Cal.4th at p. 102.)

On appeal, defendant contends he was prejudiced by the court's refusal to conduct sequestered voir dire of the prospective jurors. He points to a comment made by the court to one of the prospective jurors during voir dire. This prospective juror, who expressed strong support for the death penalty for any defendant found guilty of murder, erroneously believed that only one of the three defendants was charged with murder. The court and the prospective juror then engaged in the following colloquy: "The Court: Only [for] one of the defendants will the people be seeking the death penalty. [¶] Juror D.M.: Oh, Okay. [¶] The Court: The prosecutor, the district attorney of the county, elects who, if anyone, he chooses to seek the death penalty on. [¶] And at the time of the penalty phase he will explain to you, I'm sure, the reasons that he had for selecting one defendant over the other two, assuming that any of these people ever get convicted of anything. [¶] Can you accept that even though we're talking to you about penalty, these folks still have a presumption of innocence and are still presumed to be innocent until the contrary is proven? [¶] Juror D.M.: Yes, that I do. . . . [¶] The Court: Would you accept

the proposition that the prosecution has the right to seek the death penalty for certain individuals that fall in the category of these three defendants out here, if they choose, and you won't second guess the prosecutor as to why he chose to seek the death penalty on one defendant over the other two? [¶] Juror D.M.: No."

The prospective juror ultimately was excused for cause.[11]

Defendant argues that the trial court's comment illustrates the prejudice he suffered from the court's refusal to conduct sequestered voir dire. According to defendant, the court's comment tainted the jury pool by diminishing the prospective jurors' sense of responsibility and giving them the impression that the prosecutor had authority to determine the penalty to be imposed. He claims the court's comments reinforced the view that defendant "deserved" the penalty of death.

Defendant's generalized assertions of prejudice are without merit. The court's questioning of the juror who ultimately was excused for cause clearly made reference to the prosecution's decision to *seek* the death penalty against only one of the three defendants and, even under the most strained reading, could not reasonably be understood to advise prospective jurors that defendant "deserved" death. Defendant was not prejudiced by the court's refusal to conduct sequestered voir dire, and accordingly was not unconstitutionally deprived of a fair and impartial jury.

### 4. Admission of autopsy and crime-scene photographs and contents of victim's wallet

Defendant contends the trial court committed error by overruling his objection to the admission of crime-scene photographs and the contents of the victim's wallet. He claims the asserted error violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and parallel provisions of the California Constitution, requiring reversal of the guilt and penalty judgments. This claim is without merit.

Defendant objected to the admission of two photographs, People's exhibits Nos. 6 and 8, and to the admission of the contents of the victim's wallet, claiming this evidence was unduly prejudicial within the meaning of Evidence

---

[11] After this prospective juror was excused, defendant's counsel expressed concern that the court had suggested to the prospective jurors that they could not second-guess the prosecution's decision to seek the death penalty. The court agreed not to use such wording, and in subsequent questions explained to prospective jurors that it was the role of the jurors to decide whether capital punishment was appropriate if the charges against defendant were proved. Defendant did not seek any corresponding admonition to the prospective jurors.

Code section 352. The photograph designated as People's exhibit No. 6 depicted a bullet being held in a glove and either "an open skull or at least open flesh." The photograph designated as People's exhibit No. 8 showed the victim's wound and his hair, with blood dripping from the gunshot wound. The contents of the victim's wallet included a photograph of· two small children, a photograph of a small child seated on a horse, the victim's identification, and a $1 bill on which the words "I love you" were written. Defendant's counsel contended such evidence properly was admissible only at the penalty phase of the trial. The trial court overruled defendant's objection to the admission of the photographs, concluding they were probative and "not particularly ghastly." The court also overruled defendant's objection to the admission of the wallet's contents, finding the evidence was not inflammatory.

 We find no error in the admission of either photograph. A trial court has wide discretion to admit autopsy photographs. (*People v. Riel* (2000) 22 Cal.4th 1153, 1193 [96 Cal.Rptr.2d 1, 998 P.2d 969]; *People v. Ochoa* (1998) 19 Cal.4th 353, 415 [79 Cal.Rptr.2d 408, 966 P.2d 442].) Neither photograph in the present case was unduly prejudicial. Although photographs of murder victims often are graphic and disturbing, neither photograph here was "so gruesome as to have impermissibly swayed the jury." (*People v. Smithey* (1999) 20 Cal.4th 936, 974 [86 Cal.Rptr.2d 243, 978 P.2d 1171].) The photographs also had substantial probative value. In his statement, defendant informed the detectives that he shot the victim without aiming and did not believe, at the time of the shooting, that he had hit him. The photographic evidence indicated that the victim had been shot in the head at close range while holding his hand in front of his head, and was probative on the issue of malice and intent to kill. (*People v. Loker* (2008) 44 Cal.4th 691, 705 [80 Cal.Rptr.3d 630, 188 P.3d 580]; *People v. Crittenden* (1994) 9 Cal.4th 83, 133 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People v. Box, supra,* 23 Cal.4th 1153, 1199.) The prosecution was not obligated to " 'accept antiseptic stipulations in lieu of photographic evidence' " on these issues. (*People v. Loker, supra,* 44 Cal.4th at p. 705.)

There also was no error in admitting the contents of the victim's wallet. The prosecution referred to the photographs and the contents of the victim's wallet in both its opening statement and its closing argument at the guilt phase. During the closing argument, the prosecutor urged that the circumstance that the billfold section of the victim's wallet was empty of any money suggested that cash had been taken from the wallet during the charged crimes. Defendant refers to this circumstance, contending that the admission of the wallet improperly allowed the prosecution to treat evidence that linked the codefendants to the taking of the victim's wallet during the robbery as proof of defendant's guilt of that offense, despite his statement that he did not participate in the taking of the wallet.

The contents of the wallet had probative value, and were not unduly prejudicial. Although defendant claimed to the police that he did not participate in the taking of the victim's wallet, the uncontroverted facts establish that defendant was guilty as an aider and abettor of any theft of money from the wallet. Defendant tricked the victim into rolling down his window by asking him the time, and thereafter he and his two codefendants forced the victim from his vehicle at gunpoint and eventually into the trunk of the automobile. The codefendants evidently demanded the victim's wallet before forcing him into the trunk, but the circumstance that defendant did not make the demand or personally take the wallet does not obviate his culpability for the offense of robbery, in light of the events described above. Although the wallet contained family photographs and a notation on the dollar bill apparently indicating that someone loved the victim, these items were unlikely to provoke such a strong emotional response from the jury as to interfere with its duty to rationally decide the issue of defendant's guilt. The admission in evidence of the contents of the wallet at the guilt phase was not erroneous.

### 5. Alleged instructional error

Defendant contends that various asserted instructional errors at the guilt phase of his trial violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution and parallel provisions of the California Constitution, requiring reversal of the guilt and penalty judgments. These claims lack merit.

#### (a) Instruction on flight

The court instructed the jury with the standard language of CALJIC No. 2.52: "The flight of a person immediately after the commission of a crime or after he is accused of a crime is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all the other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is . . . a matter for you the jury to determine." Defendant objected to the instruction, asserting that evidence indicating that he left the scene of the shooting did not warrant giving the instruction, because defendant admitted shooting the victim and the prosecution did not rely upon defendant's conduct in leaving the scene to establish defendant's guilt. The prosecution argued that the instruction was warranted because the witness David Schindler testified that he observed two suspects jump a fence following a shooting, and because defendant informed the detectives that he fled after the homicide.

Defendant contends the instruction violated his rights under the Sixth, Eighth, and Fourteenth Amendments, because it compelled the jury to

draw an impermissible inference of guilt. We previously have rejected such arguments, and similarly find the claim meritless in the present case. (*People v. Mendoza, supra*, 24 Cal.4th at pp. 179–181; *People v. Smithey, supra*, 20 Cal.4th at p. 983.) Defendant is correct that because of his pretrial admission that he shot the victim, neither the identity of the actual shooter nor defendant's consciousness of guilt was a contested issue at the trial. Nonetheless, although defendant did not present any evidence in his defense, he pleaded not guilty to the charges, thereby putting in issue " 'all of the elements of the offenses.' " (*People v. Moon* (2005) 37 Cal.4th 1, 28 [32 Cal.Rptr.3d 894, 117 P.3d 591], quoting *People v. Steele* (2002) 27 Cal.4th 1230, 1243 [120 Cal.Rptr.2d 432, 47 P.3d 225].) Even if defendant conceded at trial his guilt of criminal homicide, " 'the prosecution is still entitled to prove its case and especially to prove a fact so central to the basic question of guilt as intent.' " (*Moon*, at p. 28.)

We previously have rejected the notion that the flight instruction is improper when an accused concedes the issue of identity and merely contests his or her mental state at the time of the crime. (*People v. Smithey, supra*, 20 Cal.4th at p. 983.) " 'As we have said, even where the defendant concedes some aspect of a criminal charge, the prosecution is entitled to bolster its case, which requires proof of the defendant's guilt beyond a reasonable doubt, by presenting evidence of the defendant's consciousness of guilt.' " (*People v. Loker, supra*, 44 Cal.4th at p. 707.)

(b) *Felony murder under robbery and kidnapping instruction*

The trial court instructed the jury pursuant to CALJIC No. 8.21 that "[t]he unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission or attempted commission of the crime or as a direct causal result of robbery or kidnapping is murder of the first degree when the perpetrator had the specific intent to commit such crime. The specific intent to commit robbery or kidnapping and the commission or attempted commission of such crime must be proved beyond a reasonable doubt." Defendant contends that the trial court erred in refusing his proposed modification to CALJIC No. 8.21, which would have added the following language: "If the unlawful killing is committed after the commission or attempted commission of the crime of robbery or kidnapping is completed, and is not a direct causal result of robbery kidnapping, you may not use the attempted commission or commission of the crime of robbery or kidnapping to find that the killing is a murder of the first degree."[12]

---

[12] The trial court declined to give this modified instruction proffered by defendant, but stated that defense counsel nonetheless was free to argue to the jury his theory that the underlying felonies were completed prior to the murder and thus could not serve as predicate felonies.

■ A trial court must instruct the jury, even without a request, on all general principles of law that are " 'closely and openly connected to the facts and that are necessary for the jury's understanding of the case.' [Citation.] In addition, 'a defendant has a right to an instruction that pinpoints the theory of the defense . . . .' " (*People v. Roldan* (2005) 35 Cal.4th 646, 715 [27 Cal.Rptr.3d 360, 110 P.3d 289].) The court may, however, "properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence [citation]." (*People v. Moon, supra*, 37 Cal.4th at p. 30.)

In the present case, defendant's trial counsel conceded that the requested modification merely "restated" the existing instructional language.[13] The proposed instruction would not have provided the jury with anything beyond what it otherwise learned from CALJIC No. 8.21 and CALJIC former No. 9.44, and accordingly it was duplicative and properly was refused by the trial court. (*People v. Ochoa* (2001) 26 Cal.4th 398, 455 [110 Cal.Rptr.2d 324, 28 P.3d 78] [affirming refusal to give virtually identical proposed instruction].)

(c) *Instruction on felony murder in furtherance of a conspiracy*

The jury was instructed pursuant to CALJIC No. 8.26 that "[i]f a number of persons conspire together to commit robbery or kidnapping, and if the life of another person is taken by one or more of them in furtherance of the common design, and if such killing is done to further that common purpose or is an ordinary and probable result of the pursuit of that purpose, all of the co-conspirators are deemed in law to be equally guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental." Defendant requested that the court add the following sentence to the instruction: "If the killing is not done in furtherance of the common design, or not to further the common purpose and is not an ordinary and probable result of the pursuit of that purpose, you may not use the fact that a number of persons

---

Defense counsel did so. The prosecution disputed this theory of the case, stating it was "laughable" to contend that the victim's kidnapping was "over" as he lay in the trunk of his car before defendant shot him.

[13] This is especially so because the jury also was instructed pursuant to CALJIC former No. 9.44 that a "robbery is still in progress after the original taking of physical possession of the stolen property while the perpetrator is in possession of the stolen property and fleeing in an attempt to escape. Likewise it is still in progress so long as immediate pursuers are attempting to capture the perpetrator or to regain the stolen property. A robbery is complete when the perpetrator has eluded any pursuers, has reached a place of temporary safety, and is in unchallenged possession of the stolen property after having effected an escape with such property."

have conspired together to commit robbery or kidnapping to determine that all are equally guilty of murder in the first degree."

Again, defendant's proffered modification did nothing more than restate the existing instruction to highlight defendant's theory of the case. The jury was instructed pursuant to a correct statement of the law, and defendant was not entitled to an instruction that merely stated the converse of the language that already appeared in the existing instruction. (*People v. Moon, supra*, 37 Cal.4th at p. 32; *People v. Ochoa, supra*, 26 Cal.4th at p. 455.)

(d) *Instruction on felony murder based upon aiding and abetting*

The jury was instructed pursuant to CALJIC No. 8.27: "If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of robbery or kidnapping, all persons, who either directly and actively commit the act constituting such crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first degree, whether the killing is intentional, unintentional or accidental." Seeking to modify the instruction by pinpointing the ensuing consequences in the event the jury believed the robbery or kidnapping was completed prior to the shooting of the victim, defendant requested language adding: "If a human being is killed by one of several persons after the commission or attempted commission of the crime of robbery or kidnapping was completed, who either directly and actively commit the act constituting such crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, [the defendants] are not guilty of the murder of the first degree by that reason alone, whether the killing is intentional, unintentional, or accidental."

The jury properly was instructed concerning the consequences of a determination that the underlying felonies had been completed prior to the shooting. (CALJIC No. 8.27.) As with the instructions discussed above, defendant's modification merely restated the existing instruction by presenting the converse of the instructional command, and by stating a circumstance that flowed logically from the existing language. The trial court's refusal to add duplicative language to the existing instruction was not error. (*People v. Moon, supra*, 37 Cal.4th at p. 32; *People v. Ochoa, supra*, 26 Cal.4th at p. 455.)

> (e) *Special instruction that the prosecution was bound by the contents of defendant's statement to the police*

 Defendant contends the trial court erred in refusing to give a special instruction concerning the weight and impact of his statement to the police. Defendant asked the trial court to instruct the jury that "[t]he prosecution, having presented defendant's statement in order to prove their case, are bound by that statement and its explanation for the conduct in the absence of proof to the contrary." This proposed instruction was based upon the so-called *Toledo* doctrine (*People v. Toledo* (1948) 85 Cal.App.2d 577 [193 P.2d 953]; *People v. Estrada* (1923) 60 Cal.App. 477 [213 P. 67]), concerning which we have observed: "The courts may sometimes say that the prosecution is 'bound by' extrajudicial statements of defendant which are introduced by the prosecution and which are irreconcilable with guilt, but this concept is applicable only where there is no other competent and substantial evidence which could establish guilt." (*People v. Acosta* (1955) 45 Cal.2d 538, 542–543 [290 P.2d 1] (*Acosta*).) Moreover, we noted, if there is any " 'well-established circumstance' " that is " 'incompatible' " with the defendant's exculpatory statement, then the jury may consider all the evidence in determining whether to convict. (*Id.* at pp. 541–542.)

In the present case, the trial court properly refused to give the special instruction requested by the defense. Opinions rendered by the Courts of Appeal subsequent to *Toledo* demonstrate that its holding has been superseded at least in part. "First, the so-called *Toledo* doctrine (whose genesis seems to have been merely an argument offered on appeal) actually refers to a principle of judicial review invoked in homicide prosecutions obviating a defendant's burden of showing mitigation or justification where the prosecution's proof itself tends to show same or a lesser unlawful homicide. [Citations.] . . . To the extent that the doctrine is founded upon a notion that the prosecution is bound by their witnesses' statements [citation] on the antiquated theory of vouchsafing one's own witnesses [citation], that theory has long since been discarded in favor of the modern rule allowing impeachment of a witness by any party, 'including the party calling him.' (Evid. Code, § 785; *People v. Chacon* (1968) 69 Cal.2d 765, 779 [73 Cal.Rptr. 10, 447 P.2d 106].) In the final analysis the question of defendant's guilt must be resolved from *all* the evidence considered by the jury." (*People v. Ross* (1979) 92 Cal.App.3d 391, 400 [154 Cal.Rptr. 783], fn. omitted.)

Defendant's requested special instruction was founded on an antiquated and questionable statement of the law. Moreover, even within the terms of this court's discussion in *Acosta, supra,* 45 Cal.2d at pages 541–542, the prosecution presented " 'well-established circumstance[s]' " that were inconsistent with the exculpatory content of defendant's statement. The jury plainly

was entitled to consider all of the evidence in arriving at its verdict. The trial court did not err in refusing to instruct the jury as requested by the defense.

### (f) *Special instruction regarding threats and menace*

Defendant contends the trial court erred in refusing to deliver a special instruction that threats, menace, or compulsion may vitiate the mental state required for first degree murder.

The court instructed the jury pursuant to CALJIC No. 8.20, as follows: "If you find that the killing was preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon pre-existing reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree." The trial court further instructed the jury concerning second degree murder pursuant to CALJIC No. 8.30, as follows: "Murder of the second degree is also the unlawful killing of a human being with malice aforethought when there is manifested an intention unlawfully to kill a human being but the evidence is insufficient to prove deliberation and premeditation." Defendant requested an additional instruction, which read: "You may consider evidence showing the existence of threats, menaces or compulsion that played a part in inducing the unlawful killing of a human being for such bearing as it may have on the question of whether the murder was of the first or second degree." The trial court declined to give the additional instruction.

Defendant contends that in the absence of the requested instruction, his trial counsel was precluded from directly arguing to the jury that defendant's lack of intent was predicated on the legal theory of duress— further contending that this circumstance forced counsel to argue only generally that the evidence did not support first degree murder, but instead supported a verdict of second degree murder. We find no error. It is well established that duress does not constitute a defense to murder, and does not reduce murder to manslaughter. (*People v. Anderson* (2002) 28 Cal.4th 767, 781–783 [122 Cal.Rptr.2d 587, 50 P.3d 368].) Nonetheless, duress may negate the deliberation or premeditation required for first degree murder, and an instruction such as the one requested by defendant may be appropriate if warranted by the circumstances of the case. (*Id.* at p. 784.)

No evidence was received at defendant's trial suggesting that defendant was threatened before he shot the victim. Contrary to defendant's assertion that the evidence established he shot the victim fearing that if he did not do so, his codefendant would shoot him, defendant's statement indicates that he shot the victim rather than handing the gun back to his codefendant because

he feared that if his codefendant attempted to shoot the victim, his codefendant's drunken state would cause him to mistakenly shoot *defendant*. Indeed, when asked by Detective Erickson why, upon hearing his codefendant's exhortations to kill the victim, defendant did not simply hand him the gun and tell him to kill the victim himself, defendant responded, " 'Cause . . . I don't want him to shoot me by accident." Although defendant's statement also indicates that defendant's codefendant repeatedly informed him "you gotta kill him," there is no evidence of any threat, menace, or compulsion accompanying these words.

The requested instruction was not supported by substantial evidence indicating that any threat, menace, or compulsion motivated defendant's conduct, and the trial court did not err in refusing to so instruct the jury. (*People v. Moon, supra*, 37 Cal.4th at p. 32.)

### (g) *Failure to instruct on lesser included offenses*

 Defendant contends the trial court erred in failing to instruct the jury on its own motion concerning second degree felony murder, false imprisonment, involuntary manslaughter, and certain lesser included offenses to the charged offense of robbery. The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request. (*People v. Blair* (2005) 36 Cal.4th 686, 745 [31 Cal.Rptr.3d 485, 115 P.3d 1145]; *People v. Breverman* (1998) 19 Cal.4th 142, 154 [77 Cal.Rptr.2d 870, 960 P.2d 1094] [duty to instruct on court's own motion]; *People v. Flannel* (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1] [duty to instruct upon request].) "That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser." (*People v. Blair, supra*, 36 Cal.4th at p. 745, citing *People v. Memro* (1995) 11 Cal.4th 786, 871 [47 Cal.Rptr.2d 219, 905 P.2d 1305]; see also *People v. Breverman, supra*, 19 Cal.4th at p. 154.) "To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist." (*People v. Blair, supra*, 36 Cal.4th at p. 745, citing *People v. Breverman, supra*, 19 Cal.4th at p. 162.)

Defendant asserts he was entitled to a second degree felony-murder instruction because there was evidence indicating that he lacked the intent to commit robbery and that the crime of kidnapping was completed prior to the killing. According to defendant, therefore, it would be reasonable for the jury to doubt that the killing had taken place during the course of one of the

felonies listed in section 189. Defendant also contends that had the jury been properly instructed regarding lesser included offenses of robbery—including theft, unlawful taking of an automobile, joyriding, and theft from a person—it is reasonably probable that he would have been found guilty of a felony that qualified the killing as second degree felony murder.

■ There was no substantial evidence to justify instruction on second degree felony murder. Overwhelming evidence established that defendant was guilty of kidnapping Joseph Kondrath. The victim was forced into his automobile trunk at gunpoint, driven a substantial distance, and remained in the trunk when defendant shot and killed him. As we concluded with regard to defendant's *Aranda/Bruton* claim discussed above, there is no merit in defendant's contention that the circumstance that defendant had stopped the car before shooting the victim establishes that the felony of kidnapping had been completed before the victim was murdered. Kidnapping is one of the offenses listed in section 189, and because of the overwhelming evidence supporting defendant's conviction for kidnapping Kondrath, if defendant was guilty of felony murder, that felony murder was of the first degree.

Defendant contends that an instruction on the asserted lesser included offenses of robbery such as theft, auto theft, joyriding, or theft from a person was warranted, because a reasonable juror could conclude that defendant lacked the intent to commit robbery in light of the circumstance that he did not share his codefendants' intent to take the victim's wallet and did not intend to *permanently* deprive the victim of his automobile at the time of the robbery—the specific intent required for robbery under the facts of the present case. In the alternative, he asserts that instruction on lesser included offenses was warranted because a reasonable juror could have concluded that the taking of the victim's wallet and automobile was not accomplished by the threat of force.

Defendant was not entitled to instruction on any lesser included offenses of robbery, or to an instruction on second degree felony murder, because there is no rational basis to conclude that the murder was committed during the unlawful taking of a vehicle, joyriding, or theft, but not during the commission of a robbery. If theft from the victim was committed, that theft clearly was accomplished by the threat of force—the use of a gun to take both the victim's wallet and his vehicle—and therefore constituted robbery. The evidence that the killing occurred during the commission of a crime that did not involve force is too insubstantial to support a second degree felony-murder instruction, and the trial court's failure to so instruct the jury did not constitute error. (*People v. Neely* (1993) 6 Cal.4th 877, 897 [26 Cal.Rptr.2d 189, 864 P.2d 460].)

Nor is there substantial evidence to support an instruction on any lesser included offenses of robbery on the basis that defendant did not intend permanently to deprive the victim of his automobile. Evidence in the record establishes that defendant and his companions discussed "jacking" the victim just moments before approaching him, discussed killing the victim very shortly after forcing him into the trunk at gunpoint and absconding with his vehicle, and ultimately did kill the victim. Defendant contends an instruction on lesser included offenses nonetheless was warranted because he told police that, at some point during the night, *after* the victim had been forced into the trunk and defendant and his companions had taken possession of the vehicle, he said to his codefendants that they should simply abandon the car and leave the victim unharmed, rather than killing him. Defendant's statement establishes, at best, that at some point during the robbery, defendant briefly suggested changing the planned course of action. This circumstance does not provide substantial evidence that defendant intended, at the time he and his companions forced the victim from his car and into the trunk at gunpoint, to borrow the car only temporarily, rather than permanently. Accordingly, defendant's claim is not supported by any evidence, let alone substantial evidence, justifying a second degree felony-murder instruction.

There also is no substantial evidence to justify instruction on involuntary manslaughter based upon the theory that the victim's death could have occurred during the commission of the crime of false imprisonment, a felony that is not inherently dangerous and that therefore would not support a conviction of second degree felony murder. The evidence establishing that defendant and his companions forced the victim into the trunk of his automobile at gunpoint and drove around with him in that posture points indisputably to kidnapping. Defendant offered no evidence or argument that his sole purpose was to forcibly detain the victim at the scene of the shooting. The evidence of an intent merely to detain, rather than transport, the victim was too insubstantial to support the giving of an instruction on involuntary manslaughter. The trial court's failure to so instruct the jury did not constitute error. (*People v. Neely, supra,* 6 Cal.4th at p. 897.)

### 6. *Sufficiency of the evidence*

#### (a) *Robbery and first degree felony murder predicated on robbery*

Defendant contends the evidence is insufficient to support his robbery conviction, his conviction of murder in the course of robbery or attempted robbery, and the special circumstance finding that he committed the murder while engaged in the commission of robbery. He contends the jury's verdict on these charges therefore violated his due process rights under the state and federal Constitutions.

" 'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Wallace* (2008) 44 Cal.4th 1032, 1077 [81 Cal.Rptr.3d 651]; see also *People v. Kipp* (2001) 26 Cal.4th 1100, 1128 [113 Cal.Rptr.2d 27, 33 P.3d 450]; *People v. Mayfield, supra*, 14 Cal.4th 668, 790–791 [same standard of review applies to determine the sufficiency of the evidence to support a special circumstance finding].) " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*People v. Bean* (1988) 46 Cal.3d 919, 933 [251 Cal.Rptr. 467, 760 P.2d 996], quoting *People v. Hillery* (1965) 62 Cal.2d 692, 702 [44 Cal.Rptr. 30, 401 P.2d 382]; see also *People v. Valdez* (2004) 32 Cal.4th 73, 104 [8 Cal.Rptr.3d 271, 82 P.3d 296].) "The standard of review is the same when the prosecution relies mainly on circumstantial evidence." (*Valdez*, at p. 104.)

 As stated above with reference to defendant's *Aranda/Bruton* claim, robbery is the taking of "personal property in the possession of another, against the will and from the person or immediate presence of that person, accomplished by means of force or fear and with the specific intent permanently to deprive such person of such property . . . ." (CALJIC No. 9.40.) Both robbery and felony murder based on robbery require that the intent to rob arise before force or fear is applied. Thus, "[i]f the defendant does not harbor the intent to take property from the possessor at the time he applies force or fear, the taking is only a theft, not a robbery." (*People v. Davis* (2005) 36 Cal.4th 510, 562 [31 Cal.Rptr.3d 96, 115 P.3d 417].) Similarly, "an intent to steal that arises *after* the infliction of the fatal wounds cannot support a felony-murder conviction." (*Id.* at pp. 564–565.) Finally, the special circumstance of murder during the commission of a robbery requires that the murder be committed "in order to advance [the] independent felonious purpose" of robbery, but the special circumstance is not established when the felony is merely incidental to the murder. (*People v. Green, supra*, 27 Cal.3d at p. 61; see *People v. Davis, supra*, 36 Cal.4th at p. 568; *People v. Horning* (2004) 34 Cal.4th 871, 907–908 [22 Cal.Rptr.3d 305, 102 P.3d 228].)

In the present case, the prosecutor argued to the jury that a robbery had been committed because the victim's wallet, automobile, and car keys had been taken. Defendant contends there was insufficient evidence of robbery because he and his companions did not, at the time they took the victim's car keys and automobile at gunpoint, intend *permanently* to deprive the victim of his keys or his automobile, but intended instead to use the vehicle only temporarily. With regard to the wallet, defendant contends he did not share

the specific intent of his codefendants to deprive the victim of his wallet. We conclude, to the contrary, that substantial evidence supports a finding that defendant committed a robbery, and that he possessed the specific intent to permanently deprive the victim at least of his automobile (and probably his wallet as well).

First, it is undisputed that defendant and his codefendants at gunpoint forced the victim from his automobile and into the trunk of the vehicle. Defendant conceded to the police that he employed the ruse of asking the victim the time in order to persuade him to lower his window; that prior to approaching the victim, he and the others discussed "jacking" the victim—which he explained to officers meant robbing him; that he joined his codefendants in forcing the victim from his automobile and into the trunk of the vehicle at gunpoint; and that the victim left the car keys in the keyhole of the trunk, requiring defendant to retrieve them in order to drive away. He also told Jeannette Roper that the men initially had planned to, but ultimately did not, steal the victim's car stereo. Very shortly after forcing the victim into the trunk at gunpoint, defendant and his codefendants discussed the need to kill the victim, because he would be able to identify them. Defendant clearly attempted to minimize his culpability as much as possible, consistent with the evidence. Toward this end, he informed the police that he told his codefendants that rather than killing the victim, they simply should park his vehicle somewhere, leaving the victim unharmed in the trunk, but that because his codefendants repeatedly urged him to kill the victim, he did kill him—without actually wanting to do so.

Although defendant contends this evidence establishes that he did not possess the intent, at the time he took the automobile from the victim, *permanently* to deprive him of the use of his automobile, nevertheless a reasonable jury, considering this same evidence, could reject defendant's explanation as unreasonable. The jury was not required to believe defendant's claim to the police that at the time he forced the victim into the trunk at gunpoint, he intended only to temporarily borrow the victim's automobile and eventually return it.

Additionally, substantial evidence supports a finding that defendant was guilty of robbery because he intentionally aided and abetted the codefendants in taking the victim's wallet and therefore intended permanently to deprive the victim of the money contained in that wallet. The victim's wallet was found on a street other than the one where the shooting took place. The wallet contained no money except for a $1 bill, which was found in the "wallet portion" as opposed to the "billfold part" of the wallet. As the prosecution argued to the jury, the circumstance that the billfold section of the wallet was empty supported an inference that money had been taken from it. There also

was substantial evidence suggesting that defendant shared the intent of his codefendants to steal money from the victim's wallet. Defendant informed the detectives that one of his codefendants demanded the victim's wallet immediately after defendant and the others forced the victim from his automobile at gunpoint, all three having just discussed "jacking" the victim. The victim handed the wallet to one of the codefendants before he was forced into his trunk. A reasonable jury could infer from this evidence that defendant shared the codefendants' intent to take the victim's wallet and money at the time defendant willingly joined them in forcing the victim from his automobile and into the vehicle trunk at gunpoint.

Defendant's argument regarding the sufficiency of the evidence of the robbery-murder special circumstance fails for the same reasons that apply to his primary sufficiency-of-the-evidence argument. The sole intent required for the jury to find true the robbery-murder special-circumstance allegation is the intent to commit a robbery before or during the killing. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1079–1080 [119 Cal.Rptr.2d 859, 46 P.3d 335]; *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1263 [74 Cal.Rptr.2d 212, 954 P.2d 475].) As explained above, the evidence was sufficient to permit a reasonable jury to find that defendant shot the victim in the course of robbing him.

(b) *Kidnapping for robbery, and first degree felony murder predicated on kidnapping for robbery*

Defendant contends the evidence was insufficient to support his conviction of kidnapping for robbery, and of first degree felony murder to the extent the latter offense was predicated upon murder perpetrated in the commission of a kidnapping for robbery.

"Any person who kidnaps or carries away any individual to commit robbery" is guilty of kidnapping for robbery. (§ 209, subd. (b).) "Kidnapping for robbery, or aggravated kidnapping, requires movement of the victim that is not merely incidental to the commission of the robbery, and which substantially increases the risk of harm over and above that necessarily present in the crime of robbery itself." (*People v. Rayford* (1994) 9 Cal.4th 1, 12 [36 Cal.Rptr.2d 317, 884 P.2d 1369].)

Defendant does not challenge the sufficiency of the evidence establishing that the victim was kidnapped, but asserts that the evidence was insufficient to establish that the victim was kidnapped to facilitate the commission of a robbery. His claim of error is based upon the same arguments, discussed above, that he made regarding the asserted absence of intent to commit robbery. For the reasons already stated, defendant's related claim regarding kidnapping for robbery also must fail.

### (c) *First degree felony murder predicated on kidnapping*

Defendant contends insufficient evidence supports any verdict of felony murder predicated upon a finding that the murder was committed in the course of a kidnapping. As noted above, however, there was substantial evidence demonstrating that defendant committed the crime of kidnapping— that is, that he forced the victim into the trunk of his own automobile at gunpoint, and then transported him over a substantial distance without his consent. There also was substantial evidence indicating that defendant killed Kondrath during the commission of that kidnapping, and that he killed the victim in order to advance the commission of the kidnapping—that is, to eliminate Kondrath as a witness. (See *People v. Green, supra,* 27 Cal.3d at p. 61.) The evidence was sufficient to permit a reasonable jury to find that defendant shot the victim in the course of kidnapping him.

### 7. *Asserted cumulative error*

We have not identified any error that was prejudicial, whether considered separately or cumulatively. (See *People v. Salcido* (2008) 44 Cal.4th 93, 111 [79 Cal.Rptr.3d 54, 186 P.3d 437].)

### B. *Asserted Errors Affecting the Penalty Phase of Trial*

#### 1. *Asserted "spillover" effect from denial of defendant's severance motion*

We concluded above that the trial court did not err in denying defendant's motion for severance, and that whatever error accrued from the admission of the codefendants' redacted statements at the joint trial was harmless beyond a reasonable doubt. We must address this issue again, however, because defendant claims the trial court's asserted error at the guilt phase created a "spillover" effect at the penalty phase of his trial.

■ Defendant contends the denial of his severance motion prejudiced him at the penalty phase of the trial because the joinder of the trial of the three defendants, and the admission of the codefendants' statements, permitted the prosecutor to refer repeatedly to defendant's primary role in the murder. According to defendant, the prosecution emphasized that he was the actual shooter—not an accomplice like his codefendants—and, because of this heightened culpability, that defendant should be sentenced to death. Defendant contends this argument was improper and highly prejudicial in light of section 190.3, factor (j), which allows the jury to consider "[w]hether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor."

Although the prosecutor referred to section 190.3, factor (j) and remarked upon defendant's primary role in committing the crimes against Kondrath, the comments were fully supported by defendant's own statement—in which he admitted robbing, kidnapping, and shooting the victim—and the testimony of David Schindler, who saw two men fleeing the scene of the shooting. The prosecutor did not refer at the penalty phase of the trial to the redacted statements of the codefendants, which were not admitted into evidence against defendant, and the jury was instructed not to consider those statements as evidence against defendant at the penalty phase.

We concluded above that defendant was not prejudiced by any error in admitting the redacted statements of his codefendants at the guilt phase of the trial. Similarly without merit is defendant's contention that the admission of these statements at the guilt phase—and the related denial of his motion for severance—prejudiced him at the penalty phase of his trial.[14]

> 2. *The trial court's refusal to instruct the jury that defendant's age was a mitigating factor*

Defense counsel requested a modified instruction concerning age as a factor in mitigation. Pointing to the circumstance that defendant was 18 years of age at the time of the crime, he requested that the court modify CALJIC No. 8.85 to instruct the jury explicitly that "examples of mitigating factors include" "[t]he defendant's age, immaturity, or lack of emotional development at the time of the commission of the crime." The trial court refused defendant's proffered modification and instructed the jury pursuant to the court's own modification of CALJIC No. 8.85 that "[t]he age of the defendant at the time of the crime shall not be considered as an aggravating factor."

 We discern no error in either the court's own modification of the instruction, or in its refusal to instruct the jury as requested by defendant. The trial court is not constitutionally required to instruct the jury that age is relevant only to mitigation. (*People v. Panah* (2005) 35 Cal.4th 395, 499–500

---

[14] Defendant contends the trial court erred in refusing to instruct the jury that evidence introduced at the guilt phase regarding defendant's criminal activity should not be considered a factor in aggravation. Defendant sought to have the trial court instruct the jury that "[e]vidence has been introduced in the guilt and penalty phases of this trial that may show that the defendant engaged in criminal activity which you may not consider as a factor in aggravation. You may consider only the crimes which I will define for you in determining whether or not the defendant has engaged in criminal activity which involves the use or the express or implied threat to use force or violence." The trial court declined to provide the jury with this requested instruction. Defendant does not explain, and we fail to discern, how providing the jury with this instruction would have obviated the asserted prejudicial "spillover" effect from the denial of severance, and because we find no "spillover," we also conclude the trial court did not err in refusing this proposed instruction.

[25 Cal.Rptr.3d 672, 107 P.3d 790]; *People v. Kraft* (2000) 23 Cal.4th 978, 1078–1079 [99 Cal.Rptr.2d 1, 5 P.3d 68].) The trial court did instruct the jury that defendant's age could not be considered as an aggravating factor, and the instructions as a whole permitted the jury to consider defendant's youth as a mitigating factor. (*People v. Panah, supra,* 35 Cal.4th at pp. 499–500; CALJIC No. 8.85 [instructing jury that it may consider in mitigation any "other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death"].)

### 3. *Admission of victim-impact testimony*

Defendant contends the trial court erred in admitting victim-impact evidence at the penalty phase of his trial, claiming the evidence was unduly prejudicial. The victim's father, Joseph Kondrath, mother, Joanna Kondrath, sister, Ronna Kondrath, and fiancée, Claudia Divito, testified concerning the deleterious impact of the victim's murder on themselves and others, how much they missed the victim, and the victim's sweet and peaceful nature.

■ We frequently have upheld the introduction of victim-impact evidence. "Unless it invites a purely irrational response from the jury, the devastating effect of a capital crime on loved ones and the community is relevant and admissible as a circumstance of the crime under section 190.3, factor (a)." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1056–1057 [47 Cal.Rptr.3d 467, 140 P.3d 775].) "The federal Constitution bars victim impact evidence only if it is 'so unduly prejudicial' as to render the trial 'fundamentally unfair.' " (*Id.* at p. 1056, quoting *Payne v. Tennessee* (1991) 501 U.S. 808, 825 [115 L.Ed.2d 720, 111 S.Ct. 2597].)

In the present case, each witness's testimony was brief and apparently was delivered without undue emotion, as far as the record demonstrates. The victim-impact evidence admitted in this case was typical of this type of evidence that we routinely have allowed, and came within the limits established for such evidence. (See, e.g., *People v. Boyette* (2002) 29 Cal.4th 381, 444 [127 Cal.Rptr.2d 544, 58 P.3d 391] [family members spoke of their love of the victims and how they missed having them in their lives; photographs were presented of the victims while alive].) Admission of the victim-impact testimony received in the present case did not violate defendant's constitutional rights.

### 4. *Challenge to pattern instructions*

#### (a) *CALJIC No. 8.87*

Defendant contends the trial court erred in instructing the jury pursuant to CALJIC No. 8.87 (1989 rev.) concerning its consideration of evidence of uncharged crimes.[15] The prosecution introduced evidence of three acts of violence committed by defendant against his ex-girlfriend, Sylvia Carmona, and an act of violence committed by defendant against his stepfather, Lee Thomas. At the conclusion of the penalty phase, the trial court instructed the jury pursuant to the 1989 revision of CALJIC No. 8.87, as follows: "Evidence has been introduced for the purpose of showing that the defendant has committed the following criminal acts: assaults and batteries on Sylvia Carmona on July 15, 1991, July 17, 1991, and in May of 1992 and assault with a deadly weapon on Lee Thomas on May 9, 1992, which involved the express or implied use of force or violence or the threat of force or violence. Before a juror may consider any of such criminal acts as an aggravating circumstance in this case, a juror must first be satisfied beyond a reasonable doubt that the defendant did in fact commit such criminal acts."

Defendant contends that the use of revised CALJIC No. 8.87 was error because its language constituted a directed verdict to the jury as to (1) whether the uncharged conduct constituted a crime, and (2) whether the evidence involved the express or implied use of force or violence or the threat of force or violence under section 190.3, factor (b). "We have held, however, that the characterization of other crimes as involving express or implied use of force or violence, or the threat thereof, is a legal question properly decided by the court." (*People v. Loker, supra,* 44 Cal.4th at p. 745; see *People v. Monterroso* (2004) 34 Cal.4th 743, 793 [22 Cal.Rptr.3d 1, 101 P.3d 956].)

Defendant also contends that because the trial court instructed the jury in the terms of CALJIC No. 8.87, and failed to require unanimity regarding factors in aggravation, the penalty phase of his trial was constitutionally inadequate in that the error interfered with the jury's ability to make a reliable determination of the appropriate punishment, in violation of the Eighth Amendment to the United States Constitution. The second paragraph of CALJIC No. 8.87 informed the jury: "It is not necessary for all jurors to agree. If any juror is convinced beyond a reasonable doubt that such criminal activity occurred, that juror may consider that activity as a fact in aggravation."

Defendant acknowledges that we previously have held that nothing in the federal Constitution or in statutory law requires the penalty phase jury to

---

[15] Language similar to CALJIC No. 8.87 now appears in CALCRIM No. 764.

agree unanimously that a particular aggravating circumstance exists. (*People v. Williams* (2008) 43 Cal.4th 584, 648–649 [75 Cal.Rptr.3d 691, 181 P.3d 1035]; *People v. Berryman* (1993) 6 Cal.4th 1048, 1101–1102 [25 Cal.Rptr.2d 867, 864 P.2d 40].) Defendant contends, however, that our prior conclusions have been abrogated by the United States Supreme Court's decisions in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] and *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428]. We previously have rejected this contention. "While each juror must believe that the aggravating circumstances substantially outweigh the mitigating circumstances, he or she need not agree on the existence of any one aggravating factor. This is true even though the jury must make certain factual findings in order to consider certain circumstances as aggravating factors. As such, the penalty phase determination 'is inherently moral and normative, not factual . . . .' (*People v. Rodriguez* (1986) 42 Cal.3d 730, 779 [230 Cal.Rptr. 667, 726 P.2d 113].) Because any finding of aggravating factors during the penalty phase does not 'increase[] the penalty for a crime beyond the prescribed statutory maximum' (*Apprendi, supra,* 530 U.S. at p. 490), *Ring* imposes no new constitutional requirements on California's penalty phase proceedings. Accordingly, our rulings rejecting the need to instruct on the presumption of innocence during the penalty phase still control." (*People v. Prieto* (2003) 30 Cal.4th 226, 263 [133 Cal.Rptr.2d 18, 66 P.3d 1123].)

### (b) CALJIC No. 8.85

Defendant contends the trial court erred by refusing to modify the language of pattern instruction CALJIC No. 8.85,[16] which sets forth the mitigating factors to be considered by the jury in making its penalty determination. Defendant sought to modify the instructions to add 22 additional specific examples of mitigating evidence such as "[w]hether the defendant was a loving and helpful man in his relationship with his friends and relatives"; "[w]hether the defendant has a calming and guiding effect upon other inmates"; and "the absence of any prior felony or misdemeanor convictions." The trial court refused to modify the standard instruction as requested by defendant and instructed the jury according to the pattern language of CALJIC No. 8.85, with the modification discussed above relating to defendant's age.

Defendant contends that asserted defects in pattern instruction CALJIC No. 8.85 prejudicially affected the jurors' understanding of their weighing function, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. We decline to reconsider our prior decisions holding that this instruction is not flawed for its failure to identify which facts may be considered aggravating and which may

---

[16] Language similar to CALJIC No. 8.85 appears in CALCRIM No. 763.

be considered mitigating (*People v. Cruz* (2008) 44 Cal.4th 636, 681 [80 Cal.Rptr.3d 126, 187 P.3d 970]; *People v. Valencia* (2008) 43 Cal.4th 268, 309 [74 Cal.Rptr.3d 605, 180 P.3d 351] ["CALJIC No. 8.85 is both correct and adequate."]); that the trial court is not compelled to delete assertedly inapplicable factors from the instruction (*People v. Farnam* (2002) 28 Cal.4th 107, 191–192 [121 Cal.Rptr.2d 106, 47 P.3d 988]); and that the instruction does not " 'encourage the double counting of aggravating factors.' " (*People v. Ayala* (2000) 24 Cal.4th 243, 289 [99 Cal.Rptr.2d 532, 6 P.3d 193].)

(c) *Special instruction regarding the role of sympathy and mercy*

Defendant contends the trial court's refusal to give his proffered instructions regarding the consideration of sympathy and mercy violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and parallel provisions of the state Constitution. Defendant's proposed instruction informed the jury that mitigating evidence did not excuse the offense, but that "fairness, sympathy, compassion, or mercy, may be considered in extenuating or reducing the degree of moral culpability."

The trial court instructed the jury pursuant to CALJIC No. 8.85, which provides, in relevant part, that the jury may consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial." (CALJIC No. 8.85, factor (k).) The prosecutor did not argue to the jury that it should not consider sympathy or mercy. We have concluded that CALJIC No. 8.85 adequately instructs the jury concerning the circumstances that may be considered in mitigation, including sympathy and mercy. (*People v. Brasure* (2008) 42 Cal.4th 1037, 1070 [71 Cal.Rptr.3d 675, 175 P.3d 632].) There was no error. (*People v. Wader* (1993) 5 Cal.4th 610, 663 [20 Cal.Rptr.2d 788, 854 P.2d 80]; *People v. Caro* (1988) 46 Cal.3d 1035, 1067 [251 Cal.Rptr. 757, 761 P.2d 680].)

(d) *Special instructions regarding mitigating factors*

Defendant contends the trial court's refusal to give his proffered instructions concerning the distinction between (and the proper use of) aggravating and mitigating factors violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and parallel provi-

sions of the state Constitution. These instructions would have advised the jury, in varied ways, that they might consider any evidence in mitigation—including specifically the absence of prior felony convictions—and that any mitigating factor, standing alone, could support a determination that death was not the appropriate punishment in this case. Defendant also sought to have the jury instructed that the view of any one juror that a factor in mitigation exists is sufficient to allow any other juror to consider such factor to have been established, and that the jurors may require a degree of certainty—for proof of guilt—greater than proof beyond a reasonable doubt. Defendant contends his requested special instructions merely supplemented the general principles contained in the pattern CALJIC instructions rendered by the court.

In asserting error in the trial court's rejection of his proposed instructions, defendant contends, again, that CALJIC No. 8.85 is defective. He asserts that his proffered special instructions would have corrected those defects, but the sole specific example he provides is that one of his instructions would have informed the jury that the absence of any prior felony conviction incurred by defendant could not be treated as a factor in aggravation but *only* as mitigation. The pattern instruction, however, does not suggest that the absence of any mitigating factor should be considered in aggravation. (*People v. Page* (2008) 44 Cal.4th 1, 51 [79 Cal.Rptr.3d 4, 186 P.3d 395].) As noted above, we repeatedly have held CALJIC No. 8.85 to be "correct and adequate." (*People v. Valencia, supra,* 43 Cal.4th at p. 309.) There was no error.

### (e) *CALJIC No. 8.84.1*

Defendant contends he was denied his right to due process and to a reliable determination of penalty under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because the trial court instructed the jury, pursuant to CALJIC No. 8.84.1, that it "must determine what the facts are from the evidence received during the entire trial unless you are instructed otherwise." Defendant, acknowledging that his proffered alternative set of instructions merely supplemented the standard CALJIC instructions, sought to have the jury instructed regarding the consideration to be given to the guilt phase evidence and verdict and to the evidence of uncharged violent acts.[17] The trial court declined to give defendant's proffered instructions. Defendant asserts that the pattern instruction erroneously

---

[17] Specifically, defendant sought the following instructions with respect to the determination of penalty:

"You may not treat the verdict and finding of first degree murder committed under special circumstances[s], in and of themselves, as constituting an aggravating factor . . . ."

"You must not consider as an aggravating factor the existence of any special circumstance if you have already considered the facts of the special circumstance as a circumstance of the

permitted the jury to consider in aggravation the crimes his codefendants committed against Cynthia Melson when they fired into her apartment.

Defendant's claim is without merit. Defendant told the detectives that he willingly accompanied his codefendants to obtain a gun that was to be used to fire at members of the Watergate Crips gang. Defendant drove his codefendants to the area where Cynthia Melson lived. Forensic experts testified that the shotgun shell casings and wadding recovered from inside the Melson residence were from the same type of cartridge as the casings recovered from Kondrath's automobile. From this evidence, the jury was entitled to conclude that defendant aided and abetted in the firing of shots into Melson's apartment and, therefore, because that shooting constituted part of the criminal activities committed by defendant that night, the jury was entitled to consider the incident at the penalty phase of the trial. It is also beyond dispute that the incident constituted criminal activity involving the use of force—activity that therefore could be considered by the jury in aggravation pursuant to factor (b) of section 190.3.

(f) *CALJIC No. 8.88*

The trial court instructed the jury in the language of CALJIC No. 8.88,[18] which defines factors in aggravation and mitigation. Defendant asserts the court erred by refusing to give the modified version of the instruction he requested regarding the proper manner of weighing aggravating and mitigating factors.[19] We repeatedly have held that the standard version of CALJIC

---

crimes for which the defendant has been convicted. In other words, do not consider the same factors more than once in determining the presence of aggravating factors."

"Evidence has been introduced in the guilt and penalty phases of this trial that may show that the defendant engaged in criminal activity which you may not consider as a factor in aggravation. You may consider only the crimes which I will define for you in determining whether or not the defendant has engaged in criminal activity which involves the use or the express or implied threat to use force or violence."

"Although evidence was presented at the guilt phase of this trial, which may have tended to establish that the defendant may have been involved in non-violent criminal activity that did not result in a felony conviction, you may not consider that evidence in determining which sentence to impose. Remember, the only facts that can be considered by you as aggravating factors are those set forth in subparagraphs (a), (b), and (c) above."

[18] Language similar to CALJIC No. 8.88 appears in CALCRIM No. 763.

[19] Specifically, defendant sought to have the jury instructed that:

"Each juror makes an individual evaluation of each fact or circumstance offered in mitigation of penalty."

A finding of mitigation could be made by one or more members of the jury, and "any member of the jury who finds the existence of a mitigating factor may consider such a factor established, regardless of the number of jurors who concur that the factor has been established."

Only specific aggravating factors may be considered, and although *any* evidence might constitute a factor in mitigation, "[y]ou are not permitted to consider any factor as aggravating

No. 8.88 is adequate and correct. (*People v. Boyette, supra,* 29 Cal.4th 381, 464–465; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1160–1161 [124 Cal.Rptr.2d 373, 52 P.3d 572]; *People v. Gurule* (2002) 28 Cal.4th 557, 661–662 [123 Cal.Rptr.2d 345, 51 P.3d 224].) Defendant's proffered instructions merely restated the principles that flowed logically from the pattern instructions, and the trial court was not required to inform the jury that the sole aggravating factors it may consider are those listed in its instructions. (*People v. Berryman, supra,* 6 Cal.4th at p. 1100.)

### (g) Burden of proof

Defendant also proffered jury instructions purporting to inform the jury regarding the respective burdens of proof required at the penalty phase.[20] The trial court properly declined to give these instructions.

"[E]xcept for prior violent crimes evidence and prior felony convictions under section 190.3, factors (b) and (c), the court need not instruct regarding a burden of proof . . . . [Citations.]" (*People v. Cruz, supra,* 44 Cal.4th at p. 681.) Because " '[u]nlike the guilt determination, "the sentencing function is inherently moral and normative, not factual" [citation] and, hence, not susceptible to a burden-of-proof quantification' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 589 [36 Cal.Rptr.3d 340, 123 P.3d 614]), it is sufficient that the jury was instructed that " '[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in

---

unless it is specified on the list of factors you have been given previously. There is, however, no limitation on what you may consider as mitigating."

In considering mitigating evidence, any such evidence may warrant a sentence less than death, and "you may return a verdict of life imprisonment without possibility of parole even if you find that the factors and circumstances in aggravation outweigh those in mitigation."

[20] Defendant's proffered instructions stated, in relevant part:

"A mitigating circumstance need not be proved beyond a reasonable doubt nor even by a preponderance of the evidence, and each juror may find a mitigating circumstance to exist if there is any evidence to support it."

"A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in the case of a reasonable doubt as to whether the aggravating factors exist, he is entitled to have you not consider such factors in your deliberations on the appropriate penalty unless so proved. All twelve jurors must agree as to the existence of any aggravating factor before it may be considered by you. If the jury does not unanimously agree that the existence of an aggravating factor has been proven, no juror may consider it in reaching their penalty verdict."

"If you have a doubt as to which penalty to impose, death or life in prison without the possibility of parole, you must give the defendant the benefit of the doubt and return a verdict fixing the penalty at life in prison without the possibility of parole."

comparison with the mitigating circumstances that it warrants death instead of life without possibility of parole.' " (*Ibid.*) Moreover, "[t]he United States Supreme Court decisions rendered in *Ring v. Arizona*[, *supra*,] 536 U.S. 584 . . . and *Apprendi v. New Jersey*[, *supra*,] 530 U.S. 466 . . . do not compel a different conclusion." (*Ibid.*; see also *People v. Williams, supra,* 43 Cal.4th at p. 649 [the high court's decision in *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856] does not compel a different result].)

(h) *Special instruction regarding role of mitigating factors*

Finally, defendant asserts the trial court erred in refusing to give an instruction informing the jury that, with regard to the statutory aggravating factors, the "factors which I have just listed are the only factors that can be considered by you as aggravating factors," but that "[a]ny one of the mitigating factors, standing alone, may support a decision that death is not the appropriate punishment in this case."

No modified instruction was warranted. The jury was instructed pursuant to CALJIC No. 8.88 regarding the weighing of aggravating and mitigating circumstances. We note, too, that in argument to the jury, the prosecution acknowledged, "if you find one factor that is mitigating, that alone can be the basis for your returning a verdict other than death." It thus was clear to the jury that a single mitigating factor, standing alone, could justify a verdict of life imprisonment rather than a verdict of death.

5. *Asserted prosecutorial misconduct*

Defendant alleges prosecutorial misconduct occurred stemming from several remarks made by the prosecutor during closing argument. As noted above, defendant requested that the trial court instruct the jury that the absence of mitigation did not constitute aggravation, that defendant demonstrated remorse, and that defendant likely would not be a danger to others were he to be sentenced to life imprisonment without the possibility of parole. Defendant asserts that the objective of these requests, all denied by the trial court, was to preclude the prosecution from arguing contrary propositions. Defendant now contends the prosecutor's purported assertions in closing argument that the absence of mitigation constituted aggravation, that defendant failed to demonstrate any remorse, and that defendant *would* present a danger to others were he not sentenced to death, constituted misconduct.

Defendant acknowledges that he did not object to the prosecutor's closing argument, but contends that his claim of prosecutorial misconduct is not forfeited on appeal, because he requested special instructions that would have

informed the jury of the converse of the prosecutor's statements. In the alternative, he urges us to review his claim pursuant to section 1259, which permits an appellate court to review a claim of instructional error in the absence of objection at trial if a defendant's substantial rights were affected. Neither of defendant's arguments for preservation of the issue has merit, and his claim is forfeited. (*People v. Carasi* (2008) 44 Cal.4th 1263, 1315 [82 Cal.Rptr.3d 265, 190 P.3d 616].) As we concluded above, defendant's claims of instructional error lack merit, and therefore he has not shown an abridgement of a substantial right. In any event, a request for a special jury instruction is not the equivalent of or a substitute for a required objection to prosecutorial misconduct.

 Even if defendant had preserved this claim, it lacks merit. The prosecutor is entitled to note the absence of the mitigating circumstance of remorse and may comment upon a capital defendant's potential for future dangerousness. (*People v. Salcido, supra,* 44 Cal.4th at p. 160 [finding no statutory bar to a logical comment on a defendant's lack of remorse, and finding such remarks proper]; *People v. Davenport* (1985) 41 Cal.3d 247, 288 [221 Cal.Rptr. 794, 710 P.2d 861] [a prosecutor's comments on a capital defendant's future dangerousness are "within the proper bounds of argument to the jury"].) Moreover, the record does not support defendant's contention that "the prosecutor argued that absence of mitigation constituted aggravation." The prosecutor, although observing that defendant did not avail himself of opportunities to succeed at home, in school, or at work, did not urge at any point that the absence of mitigating factors, including remorse, should be considered in aggravation.

### 6. *"Spillover" effect of guilt phase errors on penalty determination*

Defendant renews many of the same claims he made concerning the guilt phase of his trial, contending that alleged guilt phase errors rendered the penalty determination unreliable. Specifically, he points to the asserted errors in admitting autopsy and crime scene photographs, the claimed insufficiency of the evidence supporting his convictions for kidnapping for robbery and first degree murder; asserted instructional errors concerning flight and the defense theory of the case; and the court's failure to instruct on various lesser included offenses. He claims that these asserted errors in the aggregate improperly prejudiced the jury at the penalty phase of the proceedings. As explained above, there is no merit in any of defendant's claims that error was committed at the guilt phase, and accordingly his contention that such errors cumulatively were prejudicial at the penalty phase lacks merit.

### 7. Failure to instruct the jury not to "double count" special circumstances, and related prosecutorial misconduct

As described above, defendant requested special jury instructions that would have informed the jurors that they could not "double count" certain facts as factors in aggravation if those facts had been relied upon by the jury in determining defendant's guilt of the charged crimes, or in determining the truth of the special circumstance allegations. As noted earlier, the trial court was not required to deliver these requested special instructions.

Defendant now contends that the prosecutor misled the jury by stating that the two special-circumstance findings were to be considered separately in aggravation apart from the circumstances of the crime, and that in so doing, the prosecutor urged the jury to double count the special circumstances.

Defendant did not object to the prosecutor's remarks at trial, and accordingly his claim is forfeited. (*People v. Carasi, supra,* 44 Cal.4th at p. 1315.) Even if there were no forfeiture, we would conclude that nothing in those remarks misled the jury into considering—as separate instances of aggravation—the evidence establishing the special circumstances and the special circumstances findings themselves. The prosecutor stated: "The (a) factor, which is the circumstance of the crime and the special circumstances, which were two in this case, that you the jury found, and you can consider those as aggravating factors . . . ." This isolated statement cannot logically be read as urging the jury to double count the special circumstances when considered in the context of the prosecutor's complete argument to the jury, which otherwise made clear that the circumstances of the crime should be considered in aggravation only once. " '[W]e have already concluded that the standard instructions do not inherently encourage the double counting of aggravating factors.' " (*People v. Ayala, supra,* 24 Cal.4th at p. 289.) There is no reasonable likelihood that the prosecutor's isolated statement, when considered together with the instruction given to the jury regarding the proper consideration of aggravating factors, caused the jury to apply the challenged instruction in a way that violates the Constitution. (*Ibid.*) Accordingly, no special instruction regarding "double counting" was necessary. (*People v. Melton* (1988) 44 Cal.3d 713, 768–769 [244 Cal.Rptr. 867, 750 P.2d 741].)

### 8. Challenges to California's death penalty scheme

Defendant contends the California sentencing scheme is constitutionally flawed because it does not require explicit findings by the jury as to which aggravating factors it relied upon in reaching a death verdict. "Nothing in the

federal Constitution requires the penalty phase jury to (1) make written findings of the factors it finds in aggravation and mitigation [citations]; (2) agree unanimously that a particular aggravating circumstance exists [citations]; (3) find all aggravating factors proved beyond a reasonable doubt or by a preponderance of the evidence [citations]; (4) find that aggravation outweighs mitigation beyond a reasonable doubt [citations]; or (5) conclude beyond a reasonable doubt that death is the appropriate penalty. [Citations.]" (*People v. Williams, supra,* 43 Cal.4th at pp. 648–649.) The application of these principles to the determination of penalty does not violate equal protection principles established by the Fourteenth Amendment to the United States Constitution. (*People v. Cruz, supra,* 44 Cal.4th at p. 681 ["capital defendants are not similarly situated to noncapital defendants, [so] the death penalty law does not violate equal protection by denying capital defendants certain procedural rights given to noncapital defendants"]; *People v. Valencia, supra,* 43 Cal.4th at p. 311; *People v. Johnson* (1992) 3 Cal.4th 1183, 1242–1243 [14 Cal.Rptr.2d 702, 842 P.2d 1]; *People v. Bacigalupo* (1991) 1 Cal.4th 103, 145–146 [2 Cal.Rptr.2d 335, 820 P.2d 559].)

Similarly, we have considered and rejected defendant's claims that California's death penalty scheme is unconstitutional because it permits the jury to make multiple use of a single underlying felony (*People v. Gates* (1987) 43 Cal.3d 1168, 1188–1190 [240 Cal.Rptr. 666, 743 P.2d 301]); that unfettered prosecutorial discretion renders the death penalty scheme unconstitutional (*People v. Brown* (2004) 33 Cal.4th 382, 403 [15 Cal.Rptr.3d 624, 93 P.3d 244]); and that the 1978 death penalty statute unconstitutionally fails to narrow the class of death-eligible murders (*People v. Mungia* (2008) 44 Cal.4th 1101, 1141 [81 Cal.Rptr.3d 614]). Defendant has not persuaded us to reconsider our prior holdings, and we decline to do so.

### 9. *Denial of automatic motion to modify the penalty verdict*

After the jury returned a verdict of death, defendant moved for a new penalty trial, and, alternatively, for modification of the penalty verdict under section 190.4. He contended he did not receive a fair trial because of the improper admission of the redacted statements of his codefendants at the joint trial on the issue of guilt, and because of the trial court's refusal to give defendant's requested special instructions regarding aggravating factors. Defendant also asserted that a sentence of death was unfair because the codefendants blamed him for the underlying crimes, minimizing their own role, when in actuality it was the codefendants who urged and instigated defendant to shoot the victim. The trial court denied both motions.

Defendant now contends the trial court erred because it failed to consider the lesser sentences imposed upon his codefendants, who he continues to allege are more culpable than he in the murder. Codefendant Burnett was found guilty of murder along with defendant and was sentenced to life imprisonment without possibility of parole. Codefendant Rembert was not convicted of the murder until after appellant was sentenced to death (see fn. 2, *ante*). Defendant did not present a proportionality argument to the trial court in his motion or at the hearing on the motion, and he therefore forfeited this issue. (See *People v. Riel, supra,* 22 Cal.4th at p. 1220 [the contemporaneous objection rule applies to cases in which the modification hearing was conducted after this court's decision in *People v. Hill* (1992) 3 Cal.4th 959, 1013 [13 Cal.Rptr.2d 475, 839 P.2d 984]].)

In any event, defendant's claim is without merit. Defendant contends the trial court erred by failing to consider all applicable facts regarding defendant's involvement in the murder—most notably, that he is assertedly less culpable for the murder than his codefendants.[21] Defendant is unable to point to any evidence in the record, however—outside his own statement to the police—to support his claim, and our own examination of the record reveals that the trial court considered all of the available evidence in arriving at its decision to deny defendant's motion for new trial, or in the alternative to set aside the verdict of death.

First, the trial court specifically found that the "defendant did not commit murder while acting under extreme duress, or in fact, any duress at all," which indicates the court considered and rejected defendant's contention at trial that he killed Kondrath because of threats or compulsion exerted by his codefendants. Moreover, contrary to defendant's assertion on appeal, there is no evidence in the record to support his claim that his codefendants were "more culpable" than he in the murder. Defendant willingly left the apartment with Burnett and Rembert, intending to assault Ron Hussar and to steal his stereo. Defendant actively participated in the carjacking involving the murder victim. Defendant drove the victim's automobile, with the victim in the trunk, to Jeffrey Howard's residence to obtain a shotgun, then to a rival gang's territory in search of rival gang members, and finally, to the residence of Cynthia Melson, where codefendants fired more shots. Finally, and most notably, it was defendant, not either of his codefendants, who shot and killed the victim even though the victim was pleading for his life. Although

---

[21] "This court's refusal to conduct intercase proportionality review of a death sentence does not violate the federal Constitution. [Citation.] But when a defendant requests intracase proportionality review, as defendant does here, we review the particular facts of the case to determine whether the death sentence is so disproportionate to the defendant's personal culpability as to violate the California Constitution's prohibition against cruel or unusual punishment." (*People v. Wallace, supra,* 44 Cal.4th at pp. 1098–1099.)

defendant asserts throughout his briefing that his codefendants were "more culpable" than he because he shot the victim at their urging, this assertion does not supersede the evidence in the record establishing defendant's primary role in the victim's murder.

Under these circumstances, the trial court carefully and properly performed its duty under section 190.4. No error under state law or federal constitutional law appears.

### 10. *Alleged cumulative error*

Defendant asserts that numerous alleged errors committed during both the guilt phase and the penalty phase of his trial, even if not individually requiring reversal of the judgment, cumulatively impacted the jury's penalty determination and require reversal of the judgment of death. We find no error, whether considered singly or cumulatively, that would warrant reversal.

### 11. *California's methods of execution*

Defendant contends California's "default" method of execution—lethal injection—is unconstitutional because the state's failure to comply with the statutory mandate to develop proper standards for the administration of lethal injection violates his right to due process of law. He also asserts that both lethal injection and the alternative method of execution, the administration of lethal gas, constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. As we previously have held, a challenge to the method of a future execution is not cognizable on appeal, because such a claim does not impugn the validity of the judgment. (*People v. Demetrulias* (2006) 39 Cal.4th 1, 45 [45 Cal.Rptr.3d 407, 137 P.3d 229]; *People v. Holt* (1997) 15 Cal.4th 619, 702 [63 Cal.Rptr.2d 782, 937 P.2d 213].)

### 12. *Violations of international law*

Defendant contends that the asserted denials of his state and federal constitutional rights constitute violations of international law. We have found no denial of defendant's constitutional rights, and accordingly the premise of defendant's argument fails. (*People v. Mungia, supra,* 44 Cal.4th 1101, 1142–1143.) Additionally, defendant implies his rights under international law were violated because he suffers from mental impairment. No evidence in the record supports this claim.

## IV.

## CONCLUSION

For the foregoing reasons, we affirm the judgment in its entirety.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied September 30, 2009.